JENNIE E. COHEN & others *vs.* UNITED STATES TRUST SECURITIES CORPORATION & others.

Suffolk.    December 2, 1941. — February 26, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, & COX, JJ.

*Trust*, Breach of trust, Massachusetts trust. *Equity Jurisdiction*, Shareholder's bill.

A suit in equity by shareholders in an investment trust of the usual Massachusetts form against the trustees thereof, seeking redress of wrongs alleged to have been committed against the trust, properly was dismissed upon findings by a master that the trust had not suffered any damage, that there was no bad faith nor improper motive on the part of the trustees and that they had not received any improper profit or advantage individually.

A shareholder in a Massachusetts investment trust, an intelligent business woman, was not entitled to relief in equity against the trustees on the ground that, by a letter from the trustees she was induced to consent to a merger of the trust with another trust whereas, if she had not so consented and there nevertheless had been consent of two thirds of the shareholders essential to accomplish the merger, she would have realized more for her shares, where findings by a master showed that all parties recognized that the proposed merger was advantageous to the shareholders; that, while the letter did not state expressly that withholding consent might be more profitable to a shareholder, all other relevant details were stated and shareholders were told that copies of the trust agreement and of material documents were open for their inspection; and that the plaintiff at no time made inquiry as to her rights; there being no finding of fraudulent conduct on the part of the trustees, although they profited individually from the merger.

BILL IN EQUITY, filed in the Superior Court with a writ of summons and attachment dated February 10, 1932, and afterwards amended.

The case was heard upon the master's report by *Morton*, J.

*E. C. Park & B. Goldman*, (*H. Krinsky* with them,) for the plaintiffs.

*M. M. Horblit*, for the intervener, submitted a brief.

*J. J. Kaplan*, (*E. C. Mower* with him,) for the defendants.

Cox, J. This is a bill in equity brought in March, 1932, for an accounting and other relief predicated upon allegations that the trust, hereinafter described, is entitled to reimbursement from the defendants. The plaintiffs were Jennie E. Cohen and Cecile Cohen, hereinafter referred to as the plaintiffs, and Nathan N. Thorner, all of whom purchased shares of the trust. The master to whom the suit was referred stated that no evidence was offered with respect to the "claim" of Thorner, but that it was agreed that he had died after the institution of this suit. It does not appear from the record that any representative of his appeared. Clara G. Horblit was allowed to intervene as a party plaintiff. She too purchased shares of the trust which she now holds. The defendants are the United States Trust Securities Corporation, hereinafter referred to as the management corporation, the eight individual trustees of the trust or their legal representatives, hereinafter referred to as the trustees, and the United States Trust Company, hereinafter referred to as the bank.

The management corporation was organized in 1925 and was dissolved by act of the Legislature in 1937. The bank owned all of its stock. All of the individual defendants were officers of the bank and of the management corporation, and constituted the entire membership of the finance committee of the bank and of the board of directors of the management corporation, and they were the trustees of the United Securities Trust Associates, hereinafter referred to as the trust, an unincorporated association in the form known as a Massachusetts trust, having transferable shares and having its affairs managed by trustees. The trust was created according to the declaration of trust on September 25, 1929, for the purpose of investing and dealing in stocks and securities of all kinds, and, generally, to carry on the

business of an investment trust. On September 25, 1929, the trustees voted to authorize the issue of two hundred thousand shares of the beneficial interest of the trust, without par value, but with a stated "capital" of $50 per share; and, on the same date, the management corporation entered into a management contract with the trust by which it engaged to purchase the entire issue of these shares for sale to the general public, and agreed to act as investment counsel and to handle the affairs of the trust in the investment of its funds. These shares were to be offered to the public at not less than $53.75 a share, and the management corporation was to take and pay for, on or before October 4, 1929, all unsold shares at $50 per share. On September 26, 1929, the management corporation entered into an agreement with a brokerage concern whereby the latter agreed to join with the management corporation in selling one hundred eighty thousand shares and to be obligated, with the management corporation, to take and pay for all shares remaining unsold on October 4, 1929, at $50 per share.

Steps were taken to comply with the statutes, commonly referred to as the blue sky law, in this Commonwealth and Rhode Island. On September 27, 1929, a circular that had been approved by the trustees, and which was the only one used in selling trust shares both before and after October 4, 1929, was issued. The circular represented, among other things, that, after the sale of the two hundred thousand shares, the trust would start in business with a capital of $10,000,000. Printed in this circular was the statement that its contents were subject to the complete provisions of the declaration of trust, to which reference was made, and that copies of it might be obtained upon request.

Many hundreds of persons purchased shares of the trust. A sharp drop and a considerable fluctuation in the price of securities occurred in late September and early October, 1929, although, commencing on October 4, 1929, the average prices of industrial securities recovered, to some extent, until October 14, 1929, when they began to decline and continued to do so thereafter. October 4, 1929, was the date for the closing and settlement for shares that had been

offered for sale. In this situation, a representative of the brokerage concern suggested that the offering of two hundred thousand shares be reduced by the number of shares that it and the management corporation had been unable to sell. At the suggestion of counsel, an agreement was made by all parties concerned, including the trustees, whereby the two hundred thousand shares were issued at $50 a share to the management corporation and paid for by its check, and at the same time, the trust repurchased twenty thousand shares each from the management corporation and the brokerage concern at the same price, so that, on October 4, 1929, there would be outstanding one hundred sixty thousand shares. The master finds that this repurchase was for the purpose of cancellation, and not for investment, "that is, it was intended by the parties to this transaction that these shares should be retired and not be resold thereafter." He also finds that in "taking this action," the defendants were actuated by two motives, (1) to protect the market value of the shares then outstanding, including those of the plaintiffs, and (2) to save a loss to the management corporation and the brokerage concern by relieving them of the obligation of purchasing the entire issue which they had been unable to sell to the public; that the trustees also believed that their action was authorized by the declaration of trust, that the fair value of the shares repurchased was not less than $50 per share, and that the transaction was in the interest of the shareholders. Further findings are that the repurchase was of substantial advantage to the shareholders; that none of the trustees received any personal advantage from the transaction; that the liquidating value of a share at the close of business, both on October 3 and 4, 1929, was at least $50, and that, in so far as it is a question of fact, and if the court should rule that the management corporation was not protected by the provisions of the declaration of trust and the action of the trustees thereunder, and that the repurchase was a breach of the management corporation's contract with the trust, the trust sustained no damage thereby. He reported that there was no evidence and that he was unable to find

what difference in the investment of the funds of the trust would have taken place had the management corporation and brokerage concern been required to retain the entire issue instead of returning the forty thousand shares. On January 16, 1930, the trustees voted to reduce the capital by $2,000,000 in respect of the forty thousand shares that had been repurchased and to cancel them. On that date the liquidating value of the shares was $46.32, as against $50 per share actually paid in. On January 24, 1930, the trustees sent a statement to the shareholders which disclosed, among other things, the then liquidating value of the outstanding shares as $46.32 and that the capital stock consisted of one hundred sixty thousand shares carried as a liability of $8,000,000. One of the main contentions of the plaintiffs and the intervener is that the repurchase of the forty thousand shares was without authority.

The contract between the management corporation and the trustees provided, among other things, that no order, direction, approval, contract or obligation on behalf of the trust with or affecting the management corporation shall be deemed binding unless made in writing and signed on behalf of the trust by a majority of the trustees or by a trustee or trustees or by an officer or officers of the trust thereunto duly authorized by the trustees. In the account books of the trust, among the items of securities purchased beginning on October 4, 1929, and including the purchase of the forty thousand shares, there appeared, after the purchases of November 6, 1929, the following: "Approved October 4–November 7, 1929," followed by the signatures of four of the eight trustees, and the two checks of the trust that were issued for the purchase of the forty thousand shares were signed by two other trustees on October 4, 1929. The defendants did not contend that there was any other writing prior to November 8, 1929, constituting a written approval. The statement of the management corporation filed with the department of public utilities on October 3, 1929, gave the capital "at present" as two hundred thousand shares, and the statement of the trustees

filed with the bank commissioners of Rhode Island on October 3, 1929, gave the number of shares as two hundred thousand. The balance sheet attached to the answer to a questionnaire of the department of public utilities under date of October 9, 1929, showed that the only liability of the trust was two hundred thousand shares at $10,000,000, and also showed, as an investment owned, forty thousand shares of the trust valued at $2,000,000. Prior to October 4, 1929, the trustees had placed orders for the purchase of securities for investment. These orders were executed prior to October 4, and the purchase price exceeded the closing prices on October 3 by something over $9,000, and, as of October 4, by a little over $12,000. On October 4, 1929, the trustees purchased additional securities, the cost of which exceeded the closing prices on that day by nearly $11,000.

1. The trustees had the burden of showing that they discharged their duties with reasonable skill, prudence and judgment. *Ashley* v. *Winkley*, 209 Mass. 509, 525. *Knowlton* v. *Fourth-Atlantic National Bank of Boston*, 271 Mass. 343, 350, 351. See *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Society*, 293 Mass. 480, 485. The declaration of trust provides, among other things, that the trustees may enter into contracts with the management corporation, and that this corporation may be owned or controlled in whole or in part by any one or more of the trustees, and that the trustees may comprise in whole or in part the officers, "directors and/or stockholders of such corporation." It also provides that the trustees may buy from and sell to the bank "and/or" the management corporation securities and other property, including shares and other securities issued by the trust, and that any trustee may be a shareholder and otherwise interested in or connected with the bank and the management corporation, and that no contract, transaction or arrangement with the bank or management corporation, or in which otherwise any trustee shall be interested, shall thereby be rendered void or voidable, nor shall any trustee be rendered liable by reason only of his fiduciary relation under the declaration of trust to account for any profit arising from such contract, transac-

tion or arrangement if the nature of his interest or relation be understood by, or previously stated to, the other trustees or a majority thereof. The declaration further provides that the trustees may purchase or otherwise acquire for the trust at a cost not exceeding the liquidating value thereof at the close of business on the next preceding business day, shares or other securities issued by it, which may be retained in the treasury or disposed of by the trustees in their discretion at public or private sales, and that they may from time to time increase, decrease or adjust the capital account of the trust, but, unless they otherwise determine, no such change in capital account shall entitle any shareholder to receive any distribution of any part of the trust property. There is a further provision that the trustees shall have power to construe the declaration of trust and to act on any such construction, and that their construction of the same and any action taken pursuant thereto by the trustees in good faith shall be final and conclusive. The circular that was issued for purposes of inducing sales of the stock made direct reference to the declaration of trust, and it was stated therein that copies of the declaration might be obtained upon request.

It is not contended that the trustees were not authorized to deal with the management corporation, but it is contended that their dealings with respect to the repurchase of the forty thousand shares were without authority and in bad faith. The findings of the master that the trust sustained no damage by the repurchase of the shares, that, in fact, the repurchase was of substantial advantage to the shareholders, and that the liquidating value at the close of business on October 3 and 4, 1929, was at least $50 a share are assailed, as are the findings that the defendants were actuated by the motive to protect the market value of the shares then outstanding, including those of the plaintiffs, that the trustees acted in pursuance of this motive and in the belief that their action was authorized by the declaration of trust, that the fair value of the shares purchased was not less than $50 per share, and that the transaction was in the interests of the shareholders.

It is apparent that the master, in making these findings, rightly viewed the various transactions in the light of the events surrounding them at the time. His findings briefly refer to the widespread fall in the price of securities that began in the latter part of September and the first few days of October, 1929. Although September 25, 1929, was the actual date of the launching of the trust, it is apparent that the plans for its creation must have extended over a considerable period of time prior to that date. Despite stock market conditions, over one hundred three thousand shares had been sold at the close of business on October 4. Probably this did not include some twenty-three thousand six hundred and fifty shares that had been taken by the management corporation and the trustees. But despite these sales, it must have been apparent, as the closing date for settlement, October 4, 1929, approached, that the sale of shares would not meet expectations. Thereupon, the question of repurchase of forty thousand shares was considered, and, at the suggestion of counsel, the repurchase, so called, was made. The master refers to the agreement for repurchase as one "in point of form," and he also finds that the repurchase was for purposes of cancellation, and not of investment. In the then state of the stock market, as disclosed by the master's report, and without the knowledge that became so certain in the months and years that followed, the cutting down of financial operations was reasonably prudent. If the trustees had held the management corporation to its contract to take over all unsold shares, they would have had just so much more money with which to deal by way of investment. The master was unable to determine what would have happened in that event. In view of the finding that the shares were repurchased for purposes of retirement, and not of reinvestment, it may be unnecessary to consider that provision in the declaration of trust which permits the trustees to acquire trust shares at a cost not exceeding the liquidating value which may be retained in the treasury or disposed of at private or public sales. In this connection, however, the master found that the liquidating value of the shares at the time of the repur-

chase was at least $50 a share. It is true that, based upon the closing prices on October 3 and 4, a loss was shown as to securities already purchased. But the determination of the value of securities is a complex matter involving the consideration of many factors other than their current market price. In the absence of a report of the evidence, it cannot be said that the finding of the master as to the value of the shares at the time of the repurchase is wrong. *Heiner* v. *Crosby*, 24 Fed. (2d) 191, 194. *Rogers* v. *Strong*, 72 Fed. (2d) 455, 457; certiorari denied sub nomine *Strong* v. *Rogers*, 293 U. S. 621. *Schroeder* v. *State*, 210 Wis. 366, 374, 375.

At least one actuating motive of the trustees in repurchasing the stock was to protect the market value of the shares then outstanding. See *Penniman* v. *Sanderson*, 13 Allen, 193, 206. It is to be noticed that the repurchase was initiated by the brokerage concern, which was urged by the president of the bank and of the management corporation and one of the trustees to complete its commitment without any reduction. No evidence of bad faith or fraudulent motives appears. On the contrary, the trustees not only believed that the repurchase was in the interest of the shareholders, but the master finds that it was of substantial advantage to them, and that the trust sustained no damage thereby. We are of opinion that these findings cannot be disturbed. Nor do we agree with the contention that the repurchase was a mere sham designed to enable the underwriters to retain their commissions. This conclusion does not follow from the findings of the master. Again it is to be noticed that there is no evidence of fraud or bad faith. The trustees had power to decrease the capital account of the trust, and in this connection the declaration of trust provides that unless the trustees otherwise determine, no such change in the capital account shall entitle any shareholder to receive any distribution of any part of the trust property. Passing over this last provision, it appears that all of the trustees assented to the agreement of repurchase, four of them approved the repurchase, two of them, in addition to the four, signed the checks that were issued in payment of the shares, and, later on, the trustees voted to

cancel and retire the shares. Whether the agreement to repurchase is viewed as a modification of the original contract (see *Tashjian* v. *Karp*, 277 Mass. 42, 46), or whether the provision in the management contract that obligations on the part of the trust must be signed by a majority of the trustees, was, in effect, complied with (see *Nye* v. *Storer*, 168 Mass. 53, 55; *Beacon Trust Co.* v. *Souther*, 183 Mass. 413, 417, 418; *Rand* v. *Farquhar*, 226 Mass. 91, 97), the fact remains that the trust and the shareholders were not harmed.

The bill is brought, so far as its first aspect is concerned, as a shareholders' bill for the purpose of seeking the redress of wrongs allegedly done to the trust. The rights of the plaintiffs are derivative. See *Peterson* v. *Hopson*, 306 Mass. 597, 612. The purpose of this part of the bill is to vindicate the right of the trust. Unless there is something to vindicate, the bill must fail.

Where, as here, it does not appear that the trust has been injured, or that the plaintiffs, by virtue of their derivative rights have been harmed, there is no occasion for equity to interpose. *M'Endre* v. *Piles & Rollins*, 16 Ky. 101. *Bessel* v. *Department of Financial Institutions*, 213 Ind. 446, 459, 460. *Lyman* v. *Stevens*, 123 Conn. 591, 600, 601. *Matter of Juilliard*, 171 Misc. (N. Y.) 661, 663, 664. See *First National Bank of Boston* v. *Truesdale Hospital*, 288 Mass. 35, 45; *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Society*, 293 Mass. 480, 487, 488; *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 432–434; Am. Law Inst. Restatement: Trusts, § 179, comment d; § 209, comment b; § 211, comment d.

None of the trustees received any personal advantage from the transaction. This finding must stand in the light of the other findings. The circular that was issued disclosed a relationship of the trustees with the bank and management corporation and referred to the declaration of trust that authorized dealings between these parties. In the light of these circumstances, while subject to close scrutiny, the transaction was not improper. *Nye* v. *Storer*, 168 Mass. 53, 55. *Coates* v. *Lunt*, 210 Mass. 314, 318. The

master found that the management corporation paid five of the trustees and two other individuals $2.6673 per share on all shares purchased by them respectively, and that the trustees received "no other compensation" from either the trust or the management corporation. But the trust received $50 for each of the shares in question, and it consequently was not damaged. Furthermore, the finding of the master that these payments were compensation, cannot be disturbed. *Dodge* v. *Anna Jaques Hospital*, 301 Mass. 431, 435.

If there was any violation of the blue sky law, so called, as we do not intimate, it is unnecessary to go into this matter, inasmuch as it has not been suggested that the trust was injured by any violations, if any there were.

What has been said covers in the main the exceptions of the plaintiffs to the master's report. No further comment as to the exceptions is required. Inasmuch as the trust and the shareholders suffered no damage, and the trustees, in the circumstances, were not guilty of bad faith and received no profit or advantage to which they were not entitled, it is not necessary to pass upon the provisions or scope of the exculpatory provisions in the declaration of trust. See *Peterson* v. *Hopson*, 306 Mass. 597, 609–610; *Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55, 62.

2. The other principal transaction of which the plaintiffs complain is a merger that took place in the fall of 1931 between the trust and another investment trust. The master finds that it was recognized by all parties interested, including the trustees, that the proposed merger was advantageous to the shareholders. The declaration of trust contained provisions relative to a possible merger with another investment trust with the consent of the shareholders holding at least two thirds of all the shares outstanding. The management corporation owned over twenty-seven thousand shares of the trust and the trustees realized that without the vote of these shares the proposed merger could not be effected. The individual defendants, as directors of the management corporation, would not vote these shares in favor of the merger unless it was agreed that the

management corporation would receive seven per cent of the shares received in exchange for those of the assenting shareholders. The management contract provided, among other things, that the management corporation should be paid for the services rendered and charges and expenses incurred in managing the trust, one fourth per cent of the net fair value of the trust property quarterly. The contract further provided that it should continue in effect to the end of 1930, and thereafter continue from year to year unless and until terminated at the end of any calendar year by either party on at least thirty days' advance notice in writing, or unless and until terminated at any time upon at least thirty days' advance notice in writing to the management corporation, by writings signed by or by affirmative vote "at a meeting held for the purpose of the shareholders holding two-thirds of the outstanding shares of the Trust." Up to the time of the merger, the management corporation had been "generously compensated" for its services. The master finds that the holders of shares of the other trust involved in the merger had two important advantages over the shareholders of the merging trust. They could, at any time, at a very slight discount from the liquidating value, as matter of right, demand cash for their shares, whereas the holders of the shares of the trust involved in this suit had to sell them at the open market price, which was about two thirds of the liquidating value of the shares, and the charge for management was less. The trustees viewed the merger favorably, but did not think it was desirable to terminate the management contract merely for the purpose of getting another manager, and considered it only in connection with the merger. They believed it was not possible to obtain the assent of two thirds of the shareholders necessary to effect a merger unless the management corporation assented in behalf of its shares. On advice of counsel, there was prepared and sent to the shareholders, under date of October 9, 1931, a letter and a paper entitled "Shareholders' Consent," both of which had been approved by the trustees. The merger agreement was entered into. Shareholders owning more than two thirds of the outstand-

ing shares assented to the merger. The trust was terminated by the trustees in accordance with its terms on November 10, 1931.

The plaintiffs and the intervener contend with respect to this transaction that the letter sent to the shareholders, hereinbefore referred to, was a studied attempt to avoid the truth, and that the following statement contained in it was misleading and untrue: "The Trustees deem it inequitable to terminate the present management contract unless compensation is paid to the . . . [management corporation] for giving up the management fees which it would receive if it continued to manage the trust," and they contend further that the letter was so worded as to obscure the fact that if a shareholder did not consent, he would receive one hundred per cent of the new shares, whereas if he did consent, he would receive only ninety-three per cent.

No question has been raised as to the propriety of joining this issue in the bill with other issues presented. See *Lee* v. *Fisk*, 222 Mass. 418, 422; *Spear* v. *H. V. Greene Co.* 246 Mass. 259, 266–267; *Clough* v. *Cromwell*, 254 Mass. 132, 134.

It is to be remembered that the selling circular disclosed the facts as to the management contract, made specific reference to the declaration of trust and stated that copies of it could be obtained upon request. The letter of October 9, 1931, states, among other things, that the trustees are directors of the management corporation; that the management contract contains provisions for its termination by the trustees or by the shareholders; and that the trustees deem it inequitable to terminate the present management contract unless compensation is paid to the management corporation for giving up the fees which it would receive if it continued to manage the trust; that shares received in exchange for shares of the trust will be distributed to the trust shareholders pro rata "except that 7% of the shares otherwise distributable to each assenting shareholder will be paid to . . . [the management corporation] as compensation for cancelling its contract to manage" the trust; that to effect the merger, the written consent of at least two thirds of the outstanding shares must be obtained; and

that copies of the trust agreement of the other trust, of the proposed amendments and of the merger agreement are open to inspection of shareholders at the office of the trust. The "Shareholder's Consent" provides for a consent to the merger, "substantially in accordance with the letter from the Trustees" to the shareholders, and authorizes and directs the trustees to transfer and deliver to the management corporation in accordance with said letter, seven per cent of the new shares otherwise distributable to the signer.

The master finds that the plaintiff "Jennie E. Cohen" at no time made any inquiry of any of the defendants with respect to her rights; that a number of shareholders communicated with the brokerage concern that was a large holder of shares and with the trustees, and were informed that the seven per cent was deductible only in respect to consenting shareholders and only if two thirds of the shareholders consented to the transaction. "The plaintiffs Cohen made no inquiry of anyone upon receipt of the printed communication from the trustees. The plaintiff, Jennie E. Cohen, understood from the Trustees' letter . . . that *all* shareholders rather than 2/3rds had to assent," although it appears in the letter that, in order to effect the merger, the written consent of at least two thirds of the outstanding shares had to be obtained, and the master finds that she would not have signed the consent if she had known that the seven per cent would not be deducted if she did not sign. The plaintiffs have retained the shares of the other trust that they received in exchange and have received dividends on them. The intervener did not assent to the merger and did not turn in her certificate. The full allotment of shares of the other trust, without the seven per cent deduction, has been issued in her name. The master finds that the plaintiffs were intelligent business women, and, "If relevant," that they would not have assented to the seven per cent deduction had they understood they could have obtained the advantage of the merger without agreeing to that deduction. The plaintiffs contended before the master that the management contract could have been

terminated by notice in accordance with its provisions, and that it was the duty of the trustees so to terminate it, thereby saving the "Trust" the amount of the seven per cent discount, but the master was unable to find that the plaintiff (Jennie E. Cohen), at the time of giving her testimony, was able to state accurately what her state of mind would have been at the time when the transaction took place, or what she would have done in that situation had she been aware of the facts "which thereafter came to her attention."

There is no finding that the trustees were acting fraudulently or with dishonest motives in the seven per cent transaction, so called. The merger agreement provides, among other things, that the new shares issued to the trust shall be distributed by the latter pro rata among its shareholders, "except that, pursuant to the authorizations obtained from consenting shareholders, seven per cent (7%) of the shares to which such consenting shareholders would otherwise be entitled shall be transferred, assigned and delivered by the . . . [trust], as agent for said shareholders, to the Management Company, and said management contract shall thereupon be cancelled." The master found that the trustees, in drafting, approving and sending out the letter of October 9, 1931, to the shareholders, felt that more assents would be obtained by phrasing the letter as it was, instead of stating that if a shareholder did not sign, he would obtain one hundred per cent of the new stock, and that the trustees, in sending out the "Shareholders' Consent" in its prepared form, believed they would receive more authorizations to deduct seven per cent than they would have received if they had given the shareholders an opportunity to consent separately to the merger and the authorization of the deduction.

No doubt the trustees profited indirectly from the seven per cent transaction, but they had been profiting, it is fair to assume, from the management contract. The shareholders are fairly chargeable with notice of the provisions of the management contract and the connection of the trustees with that corporation, constituting, as they did, its

board of directors. The shareholders were informed in the letter of the existence of the management contract. The selling circular, under the subtitle "Management Fee," stated that the affairs of the trust were to be managed by the management corporation under "a management contract running from year to year after 1930." It also stated the amount of compensation that the management corporation was to receive. It is apparent from the master's report that the contents of this circular were within the knowledge of the plaintiffs, and the master found that they relied upon the statements in the letter of October 9, 1931, and "acted thereon." The declaration of trust, where provision is made for a merger with another investment trust, association or corporation, makes it plain that no such merger can be made without the written consent of shareholders holding at least two thirds of all the shares outstanding. Nothing, however, is there said as to the status of non-assenting shareholders. The shareholders were told plainly that if they assented to the merger, seven per cent of their shares would be paid to the management corporation. The assent that the plaintiffs signed authorized and directed the trust to make this transfer. The trustees, in preparing the letter to the shareholders, were confronted with two propositions: (1) the desirability of a merger that was advantageous to the shareholders, and (2) the necessity, as they viewed it, of terminating the management contract.

We are of opinion that the sufficiency of the letter of October 9, 1931, having in mind the duty that the trustees owed to the shareholders, is to be determined in the light of all the relevant facts. The plaintiffs paid $53.75 per share. On the last day set for the filing of consents to the merger, the net asset value of each share of the trust was approximately $30.43. In about two years' time, the value of shares had therefore diminished materially. At that time the market price of these shares was only about two thirds of their liquidating value. The shareholders were told that if they assented to the merger, their investment would be subjected to a further diminution of seven per cent. An

opportunity was expressed to the plaintiffs by the terms of the letter, coupled with the statements in the circular, that was used at the time of the sale, to familiarize themselves with the matters in question. The letter informed them that shareholders owning approximately fifty per cent of the shares had agreed to consent. Some of the shareholders, evidently upon inquiry, were informed, as hereinbefore stated, that the seven per cent was deductible only in respect of consenting shareholders, and only if two thirds of the shareholders consented to the entire transaction. The plaintiffs made no inquiry.

We conclude that the contentions of the plaintiffs cannot be sustained. See *Weitze* v. *Burrage,* 190 Mass. 267, 276; *Master Bakers Supply, Inc.* v. *Hopkins, Inc.* 300 Mass. 553; *Johnson* v. *Consolidated Film Industries, Inc.* 22 Del. Ch. 262, 265. The case at bar is distinguishable from cases like *Graves* v. *Morgan,* 182 Mass. 161, and *Lynch* v. *Palmer,* 237 Mass. 150, 152.

The result is that the interlocutory decree is affirmed, and the final decree is affirmed with costs.

*Ordered accordingly.*