Fabricant, J.
INTRODUCTION
This matter is before the Court for review, pursuant to G.L.c. 30A, §14(7), of a decision of the Architectural Access Board (“the board”) asserting jurisdiction over certain portions of the Heritage Lane complex, an elderly housing complex operated by the Braintree Housing Authority. For reasons that will be explained, the Court will modify the decision in part and affirm the decision in part.
BACKGROUND
The record of the administrative proceeding provides the following factual and procedural background. The Braintree Housing Authority (BHA) is a public housing authority, established pursuant to statute, for the purpose of providing publicly-funded housing for elderly, disabled, and other persons. In 1970, the BHA began construction of phase I of the Heritage Lane complex, consisting of a number of apartment buildings and a community building containing a meeting room, a kitchen, and certain other facilities for common use by residents of the apartments.
In 1972, the BHA began construction of phase II, consisting of additional apartment buildings and an addition to the community building. The community building meeting room, after the addition, has a capacity of less than one hundred and fifty people. In 1997, the BHA made certain improvements to the community building, at a cost that was more than thirty percent of the assessed value of the community building as of that time, but less than thirty percent of the replacement cost of that building. The improvements included installation of a ramp at one entrance. [1]
The BHA operates the Heritage Lane complex as a facility for elderly and disabled tenants. Persons seeking housing in the complex must submit applications, which are then reviewed pursuant to tenant selection policies dictated by state and federal law. Tenants have exclusive use of their apartments. They are free *707 to have guests in their apartments, subject to certain restrictions on overnight guests. Common areas of the complex, including the walkways and grounds and the community building, are open to the common use of tenants, their guests, and others with the permission of the BHA. No gate or other device blocks public access to the grounds of the complex. Persons making deliveries or providing services, as well as other invited and uninvited visitors, use the walkways to reach the apartment buildings. The BHA has at times granted permission for use of the community building to organizations that provide services of benefit to elderly persons, including a meals on wheels program, a blood pressure screening program, a flu vaccination clinic, and the like. On those occasions, persons having no other business in the complex have come onto the grounds for the purpose of participating in those programs.[2]
In September of 1999, Robert Arfwedson and the Braintree Commission on Disabilities complained to the board of various alleged violations of the board’s regulations at the Heritage Lane complex. The alleged violations relate to conditions in the walkways, sidewalks, ramps, building entrances, and in the community building. Among them is the allegation that the ramp installed at the community building leads to an entrance that is not a primary entrance, but is rather a service entrance. In response, the BHA filed three motions, asserting in substance that the board lacks jurisdiction over the complex.[3]
On February 28, 2000, the board held a hearing on the motions. At the hearing the board received factual material in the form of affidavits and supporting documents, and heard arguments of counsel. On May 10, 2000, the board issued the decision now under review, in which it denied the BHA’s motions and ordered the BHA to submit a response to the complaint addressing the alleged violations.[4] The board’s ruling, in substance, asserted jurisdiction over the walkways and grounds of the entire complex, including both phases, and over the community building. With respect to the ramp at the community building, the board ruled that the 1997 improvements triggered application of the board’s regulations as amended in 1996, which require that all entrances be accessible; on that basis, the board ruled that it need not determine which entrance is primary.
STATUTORY AND REGULATORY FRAMEWORK
The board was established in 1967, by enactment of Chapter 724 of the Acts of 1967, which has been codified as G.L.c. 22, 813A. The statute has been amended a number of times since its enactment. Some of the amendments have affected its scope in ways pertinent to the issues presented here.
As originally enacted, the statute recited its purpose as “To facilitate the use of public buildings by physically handicapped persons.” The statute authorized the board (then called the “board to facilitate the use of public buildings by the physically handicapped”) to promulgate regulations in service of that purpose, and provided that “no public building shall be constructed, reconstructed, altered or remodeled except in conformity” with such regulations. The original statute defined “public buildings” as “buildings constructed by the commonwealth or any political subdivision therefor with public funds and generally open to public use.”
In 1971, the legislature enacted two amendments to the statute. The first of these, c. 584 of the acts of 1971, amended the definition of “public building” to delete “generally,” and to add express inclusion of certain public entities, including public housing authorities. The act went on to provide, however, that “no rule or regulation” of the board "shall apply to any structure or appurtenance thereto constructed ... by or for public housing authorities . . . prior to the effective date of this act.” Thus, since 1971, a date after the BHA had already built phase I of the Heritage Lane complex, public housing authorities have been required to meet the board’s regulations in the construction or alteration of any facilities that are “open to public use,” but they are not required to alter such facilities that were already in existence at that time so as to bring them into compliance.
The second 1971 enactment, chapter 827 of the acts of 1971, added to the definition of “public building” the following additional language: “privately financed buildings that are open to and used by the public . . . includ[ing] transportation terminals, institutional buildings, commercial buildings exceeding two stories in height or employing more than forty persons, buildings having places of assembly of a capacity of more than one hundred fifty persons, public areas in funeral homes, rest rooms in shopping centers, hotels, motels and dormitories.” This amendment took effect with respect to buildings constructed after January 1, 1972. Thus, as of the time the BHA built phase II of the Heritage Lane complex, the statute required it to comply with the board’s regulations with respect to the construction or alteration of any facility “open to public use,” and also required private property owners to comply with the same regulations with respect to construction or alteration of facilities “open to and used by the public,” including facilities of the types specified. Neither the BHA nor other such owners, however, were required to alter such facilities that were already in existence at that time so as to bring them into compliance.
The legislature rewrote the statute in 1974, by chapter 528 of the acts of 1974, renaming the regulatory agency the “architectural barriers board.” The 1974 version empowered the board to promulgate regulations “designed to make public buildings accessible to, functional for, and safe for use by physically handicapped persons.” The 1974 version continued the statute’s coverage of “public buildings” defined to *708 include “buildings constructed by the commonwealth or any political subdivision thereof with public funds and open to public use, including but not limited to those constructed by public housing authorities” and certain other specified entities, “and privately financed buildings that are open to and used by the public.” The definition of the latter phrase was expanded to include, in addition to the .types of buildings specified in the previous version, “public parking garages or lots with a capacity of twenty-five or more automobiles, public sidewalks and ways, public areas of apartment buildings and condominiums containing twelve or more units and of funeral homes, and rest rooms and public areas of shopping centers and restaurants.” The 1974 version also applied to “five percent of the units in lodging or residential facilities for hire, rent or lease, containing twenty or more units.” Thus, as of 1974, private property owners, as well as public entities, were required to comply with the board’s regulations in the construction or alteration of the public areas of certain apartment buildings and condominiums, and in a proportion of the units in large apartment buildings. Neither public nor private property owners, however, were required to alter such facilities that were already in existence at that time so as to bring them into compliance.
A series of legislative enactments since 1974 have further expanded the scope of the statute, such that, in its present form, the statute applies to any “public building,” defined as before to include public housing authority buildings that are “open to public use,” as well as “privately financed buildings that are open to and used by the public.” The definition of the latter phrase has been expanded with respect to certain parking facilities, but is unchanged from the 1974 version with respect to apartment buildings and condominiums. The present version also applies to “all dwelling units in multiple dwellings equipped with an elevator," and “all ground floor dwelling units in multiple dwellings not equipped with an elevator.” The statute defines “multiple dwelling” as “a lodging or residential facility for hire, rent, lease or sale, containing three or more dwelling units.”
Under the authority granted it by the statute, the board has promulgated, and from time to time amended, detailed regulations governing construction and alteration of various kinds of facilities. Of particular relevance here are the provisions of 521 C.M.R. §3.3, relating to alterations to existing public buildings. Under §3.3.1, if the cost of such work “amounts to less than 30% of the full and fair cash value of the building,” and is less than $100,000, then “only the work being performed” is required to comply with the Board’s regulations. Under §3.3.2, however, if the cost of the work is either more than $100,000 or “amounts to 30% or more of the full and fair cash value of the building,” then “the entire building” must be brought into compliance. “Full and fair cash value” is defined at 521 C.M.R. §5.38 as the “assessed valuation of a building (not including the land) as recorded in the Assessor’s Office of the municipality at the time the building permit is issued as equalized at 100% valuation.” That definition, however, is subject to two exceptions, one applicable “if no assessed value exists,” and the other, at §5.38(b), as follows: “The value of multiple dwellings owned or financed by public sector agencies, local housing authorities, . . . shall be determined by replacement cost.” Section 5.53 defines “multiple dwelling,” in accord with the statute, as “A lodging or residential facility for hire, rent, lease, or sale, containing three or more dwelling units.” Section 9.1 delineates “multiple dwellings” as either “lodging facilities,” “residential facilities,” or “transient lodging facilities.” That section also refers to “public and common use spaces in Multiple Dwellings,” referencing §10, which provides that “The public and common use spaces of multiple dwellings shall be accessible.” Section 5 provides definitions of those terms; “public use” is defined at §5.63 as “interior or exterior rooms or spaces that are made available to the general public," while "common use” is defined at §5.25 as “those interior and exterior rooms, spaces, or elements that are made available for the use of a restricted group of people (for example, occupants of homeless shelters, office buildings, residences or the guests of such occupants).”
STANDARD OF REVIEW
Pursuant to G.L.c. 30A, §14(7), this court may reverse, remand, or modify an agency decision if “the substantial rights of any party may have been prejudiced” because the agency decision is based on an error of law or on unlawful procedure, is arbitrary and capricious, or is unwarranted by facts found by the agency and supported by substantial evidence. The plaintiff bears the burden of demonstrating the invalidity of the agency’s decision. See Merisme v. Board of Appeal on Motor Vehicle Liab. Policies and Bonds, 11 Mass.App.Ct. 470, 474 (1989). In reviewing an agency decision, the Court is required to “give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it” by statute. G.L. 30A, §14(7) (1997); See Iodice v. Architectural Access Board, 424 Mass. 370, 375-76 (1997); Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992); Seagram Distillers Co. v. Alcoholic Beverages Control Comm’n, 401 Mass. 713, 721 (1988). The reviewing court may not substitute its judgment for that of the agency. See Southern Worcester County Regional Vocational Sch. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982), citing Olde Towne Liquor Store, Inc. v. Alcoholic Beverages Control Comm'n, 311 Mass. 152, 154 (1977). Nor may a court reject an administrative agency’s choice between two conflicting views, even though the court justifiably would have made a different choice had the matter been presented de novo. See Zoning Bd. of Appeals v. Housing Appeals Comm’n, 385 Mass. 651, 657 (1982) (citations omitted).
*709 DISCUSSION
Although the board initially asserted jurisdiction over the entire complex, it now concedes that c. 584 of the acts of 1971 excludes phase I of the complex from its jurisdiction, because phase I was constructed prior to the effective date of that enactment. Accordingly, the dispute between the parties that remains for this Court to resolve is whether the grounds, walkways, and other common areas of phase II, and the community building, are public buildings within the meaning of the statute.[5]
The statutory definition of “public building,” as in effect at the time phase II was constructed, establishes three elements: the building must be (1) constructed by one of the public entities listed, (2) with public funds, and (3) open to public use. Hére, there is no question that all of the Heritage Lane complex meets the first two elements; the dispute is whether the portions of the complex over which the board has asserted jurisdiction are “open to public use.”[6]
In Opinion of the Justices, 313 Mass. 779, 783 (1943), the Supreme Judicial Court interpreted the phrase “open to the public use,” as used in proposed legislation relating to the expenditure of public funds for the maintenance of certain private ways. The Court said:
The meaning of the words is not necessarily limited to “open to the public use” as of right or permanently, and may include “open to the public use” by license or permission, although such license or permission is terminable at the will of the owner ... But “open to the public use” as applied to a private way naturally means that such way is actually susceptible of use by the public other than for purposes that are merely incidental to the use of the way by the owner thereof, and also that the way is open to the public at large for purposes of travel, not merely incidental to its use by the owner thereof, in a manner similar to the ordinary use for purposes of travel of a public way of the same general nature.
Attorney General Bellotti invoked that interpretation in an opinion issued in June of 1975, upon request of the Secretary of Public Safety, regarding the scope of the statute in issue here. 1975 Op. Att’y Gen. No. 68, Rep. A.G., P.D. No. 12 at 162-65. Citing cases from other jurisdictions, as well as the Opinion of the Justices, the Attorney General defined “open to public use" as “open to all who choose to enter.” 1975 Op. Att’y Gen. No. 68 at 160. On that basis, he opined that certain government buildings “that the public does not ordinarily use,” such as fire stations, power plants, public works garages and garages for government vehicles, are not within the statutory definition of public buildings.
Here, in concluding that the walkways and grounds and the community building are public buildings, the board reasoned as follows:
This is not a gated community and members of the general public are not prohibited from entering the complex. The grounds of the facility are considered to be open to the public generally in that access is not restricted. There is no dispute that the interior of the residents(’) individual units are not open to and used by the public, however the site is open to the public.
In its memorandum in this Court, the board has elaborated on that reasoning, emphasizing the use of the community building for various programs open to the public generally, and the use of the walkways and grounds for access to the community building for such events.
The BHA challenges this reasoning, emphasizing that persons who are not residents or their guests may enter and use the complex, including the walkways and grounds and the community building, only with its permission. The BHA draws an analogy to common areas of privately owned apartment complexes, which came under the scope of the statute only with the 1974 amendment. The BHA relies on the Opinion of the Attorney General, supra, as well as on Commonwealth v. Callahan, 405 Mass. 200, 204 (1989).
In that criminal case, among the elements of the offense charged was that it occurred in a place “to which the public has a right of access or ... to which members of the public have access as invitees or licensees.” The place in issue was privately owned, but commonly used by members of the public, with the knowledge of the owners but without their permission. The owners had posted “no trespassing signs,” but the signs had been vandalized and removed. Thereafter, the owners “took no affirmative steps to exclude the public,” beyond notifying police. On these facts, the Court held “for the purposes of this criminal case” that “members of the public had access to the property only as trespassers,” not as invitees or licensees. In reaching that conclusion, the Court noted particularly “the principle that criminal statutes must be construed strictly against the Commonwealth.” Id. at 205, citing Commonwealth v. Perry, 391 Mass. 808, 813 (1984).
The question presented here is a close one, not easily resolved by reference to any of the authorities cited. Callahan differs from this case with respect to both the statutory language in issue and the applicable principle of statutory construction. Rather than the strict construction applicable to the penal statute in issue there, the remedial statute involved here is subject to liberal construction so as to effectuate its purpose of promoting access for persons with disabilities. See generally, Iodice v. Architectural Access Board, 424 Mass. at 375. Nor does the cited Opinion of the Attorney General provide much assistance, since the facilities in issue here are hardly comparable *710 to the kinds of buildings that the Attorney General opined were not public; on the facts presented, it appears likely that the grounds, walkways, and community building of the Heritage Lane Complex receive far broader use than would a fire station, power plant, public works garage or garage for government vehicles.
The BHA’s analogy to privately financed apartment complexes seems particularly apt, but does not necessarily help its cause. By amending the statute to include the public areas of such facilities, the legislature clearly expressed its intention that such areas would be subject to the board’s regulations from 1974 forward. The legislature did not, however, enact a corresponding amendment to the language regarding publicly financed facilities. That omission would make sense if, in the legislature’s view, such areas were already covered as “public buildings.” If they were not, then the omission would produce the anomalous result that comparable areas of post-1974 apartment complexes would be covered if privately owned, but not if publicly owned.
The BHA’s grant of permission to members of the public for the use of its facilities is not dispositive, in light of the language, quoted supra, from Opinion of the Justices, 313 Mass. at 783. Moreover, considering the basic function of public housing authorities, to provide subsidized housing for eligible members of the population, it seems unlikely that public housing authorities would have any facilities that would be open to the general public as a matter of right, without the need of permission. Nevertheless, the legislature expressly included public housing authorities among those public entities whose facilities are covered by the statute if they are “open to public use.” Clearly, then, the legislature intended to include some type of facility that it expected public housing authorities would have. It remains to ask what such a facility would be. Certainly the legislature did not intend to cover individual dwelling units, which could not fairly be described as “open to pubic use.” The only apparent answer, then, is common areas such as the walkways, grounds, and community building in issue here.
Thus, although the question is close, the board’s resolution of it falls within the range of reasonable statutory interpretation. In light of the deference due to the board’s interpretation of the statute it is charged with administering, the Court cannot conclude that the board erred in ruling that the walkways, grounds, and community building are within the statutory definition of “public building.”
The remaining question is whether the board erred in ruling that the work done on the community building in 1997 fell under the provision of 521 C.M.R. §3.3.2, so as to trigger the requirement that the entire building be brought into compliance with the regulations as then in effect, or whether the work fell under 521 C.M.R. §3.3.1, so that only the work itself had to comply. This question depends on whether exception (b) to 521 C.M.R. §5.38 applies, so that the “full and fair cash value of the building” is to be determined by replacement cost, rather than assessed value.
The exception, by its plain terms, applies to “multiple dwellings." The particular building in issue here-the community buildingindisputably contains no dwellings at all, although the complex of which it is a part certainly does contain multiple dwellings. The board answered the question by looking at the community building alone, without reference to the rest of the complex. That approach is consistent with the language of §5.38, which refers to the full and fair cash value “of the building.”[7]
Section 9.1, on which the BHA relies, does not dictate a different approach. That provision indicates only that the board, in drafting its regulations, recognized that some multiple dwellings would contain “public and common use spaces.” It does not follow either that all such spaces are within multiple dwellings, or that a separate building containing only such spaces, and no dwellings, must be treated as part of the whole complex for purposes of §5.38. In light of the deference due the board’s interpretation of its own regulations, the Court cannot conclude that the board’s ruling on this issue was erroneous.
CONCLUSION AND ORDER
For the reasons stated, the Braintree Housing Authority’s Motion for Judgment on the Pleadings is DENIED, and the Architectural Access Board’s Cross Motion for Judgment on the Pleadings is ALLOWED. It is hereby ORDERED that JUDGMENT enter modifying the decision of the Architectural Access Board so as to exclude jurisdiction over phase I of the Heritage Lane complex, other than the community building, and affirming the decision as so modified.

 The BHA made those renovations at least in part pursuant to an agreement for judgment in a previous case, no. 96-3381, in which the BHA had sought review of an earlier AAB order requiring correction of certain claimed violations in the community building. The parties resolved that action by agreeing that the BHA would make the corrections ordered, but that it would remain free to contest the board’s jurisdiction over the building.

 The record does not indicate how frequently such use has occurred.

 One of the motions was termed a motion to dismiss, while the other two were termed motions in limine. One of the motions in limine sought a determination that the entrance at which the ramp had been placed was a primary entrance.

 The AAB has not challenged the finality of the decision for purposes of review, and on inquiry from the Court at argument expressly waived any defense on that basis.

 Although the community building was initially constructed as part of phase I, an addition to it was constructed in phase II in 1972. In its memorandum in this Court, the board distinguishes the community building from the rest of phase I based not on the 1972 addition, but on the 1997 alterations. Accordingly, the Court will not address any question of whether the 1972 addition might have triggered application of the statute with respect to the community building.

 The position taken by Mr. Arfwedson and the Braintree Commission on Disabilities, that all buildings owned by a public entity are public buildings, ignores this element.

 Apparently the town assessor employed the same approach in recording a valuation for the community building alone, rather than including it in a valuation for the entire complex.