## STEPHEN A. PILCH *vs.* TOWN OF WARE.

Hampshire.  October 15, 1979. – December 7, 1979.

Present: ARMSTRONG, ROSE, & PERRETTA, JJ.

*Police,* Salary of police chief.

Employees of a police department who were hired under the Emergency Employment Act of 1971 were not permanent, full-time employees of the department for purposes of determining the annual rate of compensation of the chief of police under G. L. c. 48, § 57G, as originally inserted by St. 1971, c. 1082.  [780-785]

CONTRACT.  Writ in the District Court of Eastern Hampshire dated June 24, 1974.

On retransfer to the Superior Court the action was heard by *Greaney,* J.

*William H. Welch* for the plaintiff.

*David A. Wojcik,* Town Counsel, for the defendant.

PERRETTA, J.  The plaintiff, the Ware police chief from 1950 to June 30, 1974, commenced an action against the defendant (the town) for wages he claims are due him under G. L. c. 48, § 57G, as originally inserted by St. 1971, c. 1082.[1] He contends that three employees of the police department, hired under the Emergency Employment Act of 1971, Pub.L.No. 92-54, 85 Stat. 146 (1971)

---

[1] Section 57G at that time provided in pertinent part: "[T]he permanent, full-time chief of police . . . in any . . . town . . . shall receive an annual rate of compensation which shall not be less than the following ratios of the highest annual rate of compensation of a permanent . . . full-time police officer: . . . (1) In departments having less than twelve permanent, full-time police officers . . . , the ratio shall be:  1.5.  (2) In departments having not less than twelve nor more than twenty-nine permanent, full-time police officers . . . , the ratio shall be:  1.8.  (3) In departments having thirty or more permanent, full-time police officers . . . , the ratio shall be:  2.0.

(E.E.A.), were permanent, full-time employees of the department and fell within the scope of § 57G and consequently that his annual rate of compensation from 1972[2] to his retirement in 1974 should have been determined on the basis of the statutory ratio of 1.8 and not on the basis of the 1.5 ratio. The trial judge found that the three employees were not permanent police officers and that the police department was therefore comprised of fewer than twelve permanent officers; he entered judgment for the defendant. We affirm the judgment.

This action was heard in the Superior Court on the basis of stipulated facts, a District Court finding for the plaintiff, and a great number of documentary exhibits. Everything which was presented to the trial judge is in the record before us, and we decide the case on this record without regard to his rulings. See *Mahony* v. *Assessors of Watertown,* 362 Mass. 210, 211 (1972); *Richardson* v. *Lee Realty Corp.,* 364 Mass. 632, 634 (1974); *Foxborough* v. *Bay State Harness Horse Racing & Breeding Assn.,* 5 Mass. App. Ct. 613, 615 (1977).

Throughout the time period here in question the Ware police department had a complement of ten permanent, full-time officers whose employment was subject to the civil service laws as set out in G. L. c. 31.[3] In addition, the police department had hired three officers under the E.E.A. Two of the three E.E.A. officers performed the same duties and had the same police powers as the ten

---

[2]Statute 1971, c. 1082, was approved on November 15, 1971, and the parties accept February 15, 1972, as the effective date of the statute. We examine the plaintiff's claim on that basis, and we do not consider what effect, if any, the subsequent amendments to § 57G, by St. 1974, cc. 415, § 1 and 610, § 1, and St. 1975, c. 333, § 1, would have on the plaintiff's claim.

[3]All references in this opinion to c. 31 are as it appeared prior to St. 1978, c. 393, § 11. The new provisions have no effect on this dispute, which was tried in the Superior Court in March, 1978. See St. 1978, c. 393, § 43.

civil service members of the force;[4] they were required to join the police union, they were subject to the rules and regulations of the department, and they were under the plaintiff's authority, control and supervision. It is also undisputed that these two employees were hired for the duration of the E.E.A., which was indefinite at the time. Based on these facts, the plaintiff argues that these two employees must be counted as full-time police officers because the word "permanent," as used in § 57G, means "of indefinite duration." He further contends that § 57G was enacted to provide police chiefs with a pay differential based on the amount of work required of them, as measured by the number of officers under the control of each. Accordingly, he asserts that any distinction between the two E.E.A. officers and the ten civil service officers based on the permanent or temporary character of their employment is arbitrary because the duties and responsibilities of a police chief relate to the total number of employees, regardless of the status of those employees as E.E.A. or civil service.

The plaintiff's argument is not supported by the Federal legislation under which the two officers were hired or by G. L. c. 31, with which § 57G must be read in harmony if possible.[5] "The mere existence of one regulatory statute does not affect the applicability of a broader, nonconflicting statute, particularly when both statutes provide for concurrent coverage of their common subject matter." *Dodd* v. *Commercial Union Ins. Co.,* 373 Mass. 72, 78 (1977).

---

[4] We shall deal only with the employment status of these two employees, because our disposition of the plaintiff's claim that they are to be considered "permanent" within the meaning of § 57G makes it impossible for the plaintiff to be upgraded to the 1.8 ratio even if his argument as to the third E.E.A. officer is accepted as valid.

[5] In 1911 Ware accepted R. L. c. 19, § 37, which provided that the police forces of towns accepting that provision would be subject to the civil service law which evolved into G. L. c. 31, § 48, and to which the Ware police were subject at all times material to this dispute.

The Emergency Employment Act of 1971 was effective immediately upon its enactment,[6] and its stated purposes, as set out in § 2 thereof, were "to provide unemployed and underemployed persons with *transitional employment* in jobs providing needed public services during times of high unemployment and, wherever feasible, related training and manpower services to enable such persons to move into employment or training not supported under this Act" (emphasis supplied). The distinctive feature of the Act was its establishment of a temporary public service employment program, the implementation and continuation of which were dependent upon the existence of a 4.5 percent or higher unemployment rate. Pub.L.No. 92-54, § 5, 85 Stat. 148 (1971). See also Senate Report No. 92-48, 92d Cong., 1st Sess. (reprinted in [1971] U.S. Code Cong. & Ad. News 1171, 1175-1176). It was intended that these transitional employees would thereafter be able to secure jobs not funded by the Act, assisted by their training and employment while E.E.A. employees. 36 Fed. Reg. 15434, § 55.2 (1971). We agree with the trial judge, who concluded that the Federal provision was "designed to spell out a broad federal policy that is subject to the changing conditions, circumstances and vicissitudes of the marketplace with reference to jobs" and that any employment secured through this legislation was of a temporary nature notwithstanding the hope it would result in permanent employment.

That our Legislature also intended that E.E.A. employment be only temporary is clear from the manner in

---

[6] This Act was superseded by the Comprehensive Employment and Training Act of 1973, Pub.L.No. 93-203, Title II, §§ 201-211, 87 Stat. 850-857 (1973), codified at 29 U.S.C. §§ 841 et seq. (1976) (CETA). The purpose of CETA was to reorganize and consolidate existing employment programs. H.R. Rep. No. 659, 93d Cong., 1st Sess. (reprinted in [1973] U.S. Code Cong. & Ad. News 2935, 2935-2937). However, the aim of the Act remained to limit these programs by providing only transitional employment to those in need. Pub.L.No. 93-203, § 201, 87 Stat. 850.

which it effectuated the purposes of that Act in this Commonwealth. E.E.A. became effective on or about July 12, 1971; on August 31, 1971, the Legislature passed two bills directly relating to the implementation of E.E.A.: namely, St. 1971, cc. 730 and 731. The latter states, in applicable part: "Any appointment made under this Act shall be deemed a temporary appointment, as defined in section one of chapter 31 [of the General Laws]." General Laws c. 31, § 1, defined a temporary appointment as one "made for a specified time, after certification from an eligible list," whereas it defined a permanent appointment as one "to a permanent position made in accordance with this chapter and the rules made thereunder, and subject to a probationary period of six months except where otherwise provided." This description of a permanent appointment was amplified by § 43(*a*) of c. 31, which provided that such an appointee had "unlimited tenure of office or employment, subject to the provisions of this chapter and the rules made thereunder." The mandate of St. 1971, c. 731, and the specifications as to "permanent" contained in G. L. c. 31, lead to the conclusion that the Legislature fully intended that E.E.A. employees would be temporary because their positions were of an indefinite duration. Their jobs would end when the Federal legislation ended or when Federal funds should no longer be available under the Act due to a fall in the unemployment rate below the level set out in § 5 of the E.E.A.

The plaintiff seeks to avoid this conclusion by arguing that, because E.E.A. was of indefinite duration, the two officers' employment thereunder was also of indefinite duration, and thus permanent, as discussed in *Moloney* v. *Selectmen of Milford,* 253 Mass. 400, 404-405 (1925), *Weiner* v. *Pictorial Paper Package Corp.,* 303 Mass. 123, 133 (1939), and *Phelps* v. *Shawprint, Inc.,* 328 Mass. 352, 354-355 (1952). He contends that these cases and not §§ 1 and 43(*a*) of c. 31 control because the use of the word "permanent" in § 57G is merely in "contradistinction" to

the word temporary. He argues that we should read § 57G independently of the civil service law notwithstanding the mandate of St. 1971, c. 731, because the latter provision was enacted merely to accommodate our civil service statute to the Federal act: he asserts that the only purpose of St. 1971, c. 731, was to prevent E.E.A. employees from automatically becoming tenured civil servants by reason of G. L. c. 31, § 15. We are not persuaded by this argument. The Legislature's insertion of the word "permanent" in § 57G specifically precluded from consideration in computing a police chief's salary all officers employed on any basis other than permanent. See e.g., *Jones* v. *Wayland,* 4 Mass. App. Ct. 725, 731 (1976), *S.C.,* 374 Mass. 249 (1978). By enacting St. 1971, c. 731, the Legislature, in turn, specifically precluded E.E.A. employees from being considered as anything other than temporary employees. Were we to regard these employees as permanent on the sole basis of the indefinite duration of the Act, we would defeat its critical function: to provide jobs without imposing additional financial obligations on hiring governmental units. Classification of E.E.A. employees as permanent would entail an increase in such obligations, as demonstrated by this very case. In light of the ramifications inherent in designating E.E.A. employees as permanent, the Legislature took the deliberate action reflected in St. 1971, c. 731, to avoid these problems, while leaving governmental units the option of incurring additional obligations by hiring E.E.A. employees on a permanent basis should they ultimately decide to do so.[7] To accept the plaintiff's position would require us to ignore this legislative scheme.

The plaintiff next asserts that a conjunctional reading of § 57G and St. 1971, c. 731, places an unintended lim-

---

[7] Subsequent to the time period in dispute, the two officers were in fact permanently hired by the defendant, and their civil service designations were changed from "for duration of Pub. L. No. 92-54" to "permanent, full-time."

itation on his salary in that it results in his having been required to supervise an increased number of officers without receiving an increased rate of pay. It is obvious, however, that § 57G was not designed to provide for salary increases in direct relation to the number of officers under the control and authority of a police chief. For example, a police chief supervising thirteen officers is paid on the basis of the same ratio as a chief supervising twenty-eight officers. (See note 1, *supra*.) Thus, the statute does not establish a direct relation between salary and the number of officers under supervision; rather, it provides parameters which establish the minimum rates of compensation for police chiefs. We may assume that the Legislature, when enacting the statute, was aware that police departments frequently employ police officers on a temporary basis, and it nonetheless chose to calibrate compensation on the basis of the clearly defined class of permanent, full-time officers. It is not our function to tamper with these statutory limits.

The plaintiff's final contention, that the overtime pay received by a police officer should be included in calculating the highest rate of compensation under § 57G, was fully considered and rejected by this court in *Kardas* v. *Selectmen of Dedham, ante* 184 (1979).

The trial judge's determination that the plaintiff was entitled to 1.5 times the base pay of the highest paid officer in the department during the years in question was correct.

*Judgment affirmed.*