DAVID K. JONES *vs.* TOWN OF WAYLAND & others.[1]

Middlesex.     November 9, 1976. — December 28, 1976.

Present: HALE, C.J., GRANT, & BROWN, JJ.

*Practice, Civil,* Master: findings, report of evidence, transcript of pro-
ceedings; Findings by judge.   *Police,* Incapacity, Resignation, Mu-
nicipality's liability.

Where a master had been specifically directed not to report any of the
evidence before him except as the second paragraph of Rule 90 of
the Superior Court, as amended, might apply, this court considered
the evidence introduced before the master only as incorporated in the
master's summaries and only for the limited purpose of deter-
mining the sufficiency of the evidence as matter of law to warrant
the two particular findings to which timely objections had been
taken. [729-730]
The provisions of G. L. c. 41, § 111F, were applicable to a "special"
police officer appointed to a six-month term of employment. [730-
731]
Although a physician had been appointed by a board of selectmen to
examine prospective police officers, he was not thereby designated
under G. L. c. 41, § 111F, to determine whether a police officer who
had been injured in the performance of his duties continued to be
incapacitated. [732-734]
An incapacitated police officer who voluntarily resigned his position
was not entitled to payments under G. L. c. 41, § 111F, subsequent
to his resignation. [734-736]
In an action by a former police officer to recover from a town pay-
ments due him under the provisions of G. L. c. 41, § 111F, the judge
erred in excluding the provisions of the officer's group insurance pro-
gram and in refusing to take into consideration any amount attrib-
utable to lost wages which the officer may have received from the
insurance company. [736-737]

BILL IN EQUITY filed in the Superior Court on March 22,
1972.

The suit was heard by *J. P. Sullivan,* J., on a master's
report.

[1] The board of selectmen of the town, the town treasurer and the
town accountant.

*C. Peter R. Gossels* (*Daniel J. Paci* with him) for the defendants.
*Robert S. Wolfe* for the plaintiff.

GRANT, J.   This is a bill for declaratory relief by which the plaintiff, a former special police officer in the town of Wayland, seeks a binding determination of his rights (if any) under the provisions of G. L. c. 41, § 111F, as appearing in St. 1964, c. 149.[2] The defendants have appealed from a final judgment of the Superior Court which determines the town's liabilities to the plaintiff under § 111F (a) up to the date approximately two months prior to the date of the judgment and (b) thereafter "until such time as . . . [the plaintiff] is retired, pensioned or determined to be no longer incapacitated in accordance with the provisions of" that section.

1. We find it necessary at the outset to give our reasons for not considering a number of the arguments advanced by the parties in their briefs before us. This case was referred to a master under a form of order which tracked the language set out in Form B found in the fourth paragraph of Rule 86 of the Superior Court, as amended effective June 1, 1970, and as in effect until July 1, 1974.[3] Both the form and the actual order of reference were explicit on the point that the master should "not report any evidence except as . . . the second paragraph of Rule 90 . . . [might] apply." On the second day of the hearing before the master the defendants secured the court's allowance of a

---

[2] "Whenever a police officer . . . of a . . . town . . . is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own . . . he shall be granted leave without loss of pay for the period of such incapacity; provided, that no such leave shall be granted for any period after such police officer . . . has been retired or pensioned in accordance with law or for any period after a physician designated by the board or officer authorized to appoint police officers . . . in such . . . town . . . determines that such incapacity no longer exists. All amounts payable under this section shall be paid at the same times and in the same manner as, and for all purposes shall be deemed to be, the regular compensation of such police officer . . . ."

[3] See the form of order of reference to a master in a nonjury action which is now found in Rule 49, § 2, of the Superior Court (1974).

motion under G. L. c. 221, 91C (inserted by St. 1967, c. 138),[4] that certain stenographers named therein[5] "report the testimony to be heard by ... [the master] and that said stenographer[s] shall file a certified transcript thereof in the Clerk's Office pursuant to the provisions of Rule 79 of the Superior Court."[6]

The defendants filed with the master a number of objections to his report which purported to raise questions as to the sufficiency of the evidence to warrant particular findings appearing in the report. The defendants' requests for summaries of the evidence relied on in support of the challenged findings were ignored by the master, who filed his report with only the objections appended thereto. On the defendants' motion the court recommitted the report to the master for the purpose of providing the summaries which had been originally requested by the defendants. The master thereupon provided and filed the relevant summaries, with citations to specifically numbered pages of the transcript of the proceedings where (the master said) there could be found the evidence relied upon by him to support each of the findings in question.

The entire transcript of the proceedings before the master was subsequently filed in the clerk's office, as well as all the exhibits which had been introduced in evidence before the master. See Rule 50 of the Superior Court (1974) and Mass.R.Civ.P. 53(e)(1), as amended effective February

[4] "Any party to a civil proceeding assigned to trial before an auditor or master may, upon motion duly made to the court, have such proceedings recorded at his own expense. Such party shall include in his motion the name of the official stenographer to be designated by the court. Said official stenographer, after being duly sworn, may take notes of all testimony adduced before the auditor or master. The transcripts thereof, after certification by said stenographer, shall be admissible in evidence in any further trial or hearing of the matter as evidence of testimony given, whenever proof of such testimony is otherwise competent."

[5] We pass the question whether the persons named in the motion were "official stenographers" within the meaning of G. L. c. 221, § 91C. See G. L. c. 221, §§ 82, 90A, 91 and 91B.

[6] It is not clear what rule was intended to be referred to in the motion. Neither Rule 79 nor Rule 89 of the Superior Court (1954) had any application to the circumstances of this case.

24, 1975, 367 Mass. 917.[7] The judge by whose order the
final judgment was ultimately entered appears to have
read the transcript in its entirety before adopting the mas-
ter's subsidiary findings of fact.[8] The judge, acting under
Mass.R.Civ.P. 53(e)(2), 365 Mass. 820 (1974), enter-
tained further evidence on the question whether a physi-
cian referred to in the master's findings had been "desig-
nated by the board or officer authorized to appoint police
officers" within the meaning of G. L. c. 41, § 111F. The
master had made no finding on this point; the judge's find-
ings on this point were based solely on the evidence heard
by him.

In their brief before us the defendants have sought to
develop numerous arguments to the effect that the judge's
subsidiary findings (which were really those of the master
except on the one point on which the judge himself enter-
tained testimony) were not supported by the evidence or
were "clearly erroneous." Such arguments are buttressed
by copious references to the transcript of the proceedings
before the master and to the exhibits before him, all of
which have been reproduced in the defendants' appendix.
Only two of these arguments are truly addressed to the
sufficiency of the evidence to warrant particular subsidiary
findings of the master to which timely objections had been
taken under the first paragraph of Rule 90 of the Superior
Court (1954); we have examined the evidence relied on by
the master in response to those objections (both as sum-
marized by him and as appearing in the specific pages of
the transcript referred to by him) and have concluded that
there is no merit to either objection.

---

[7] The master's report and his subsequent summaries were all pre-
pared and filed prior to July 1, 1974. The transcript and exhibits were
not filed until after that date. It does not appear that the defendants
served any additional objections to the report (or to any of the sum-
maries) after that date.

[8] The record is unclear as to how many (if any) of the exhibits be-
fore the master were considered by the judge before he adopted the
master's subsidiary findings. In the view we take of the case nothing
turns on whether the judge did or did not study those exhibits.

On analysis, the balance of the defendants' arguments addressed to the judge's (master's) subsidiary findings turn out to be ones to the effect that many of those findings were contrary to the weight of the evidence before the master. However, as has already been explained, the master had been specifically directed not to report any of the evidence before him "except as . . . the second paragraph of Rule 90 . . . [might] apply." Accordingly, none of the evidence introduced before the master was properly before the judge (or is properly before us) except as incorporated in the master's summaries and only for the limited purpose of determining the sufficiency of the evidence as matter of law to warrant the two particular findings to which timely objections had been taken. *Michelson* v. *Aronson, ante,* 182, 183-190 (1976). That limited purpose was served in those two instances.

Nor does the defendants' invocation of the provisions of G. L. c. 221, § 91C (note 4, *supra*), require a conclusion different from any of those reached in the *Michelson* case. The provisions of that section are directed to entirely different situations, ones in which there may subsequently be a disputed question of fact as to what the evidence was before a master or in which the evidence before a master may become material for some other reason at a subsequent trial of the same issues. See, e.g., *Roslindale Gen. Hosp. Inc.* v. *Beckwith Elevator Co.* 3 Mass. App. Ct. 723 (1975). Their only effect on the long established practice before masters in nonjury cases is to substitute the court's approval for that of the master in the selection of the stenographer who is to take and transcribe the proceedings before the master. See the second sentence of the second paragraph of each of Rule 90 of the Superior Court (1954) and Rule 49, § 7, of the Superior Court (1974).

It follows from what has been said that we do not entertain any of the defendants' arguments concerning the validity of the judge's (master's) subsidiary findings except in the two instances already considered and decided adversely to the defendants. Accordingly, we proceed un-

der the well established rule that " 'both the trial judge and the appellate justices are required to treat the master's [subsidiary] findings of fact as binding unless they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law.' " *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660 (1975). *Michelson* v. *Aronson*, *ante*, at 190. As we see no inconsistency in or contradiction between the subsidiary findings in the single instance which has been urged by the defendants, we proceed to the substantive questions of law raised by the appeal.

2. The master's findings, as slightly reworded by the judge, include the following: "On August 23, 1970, Jones, who was then 21 years of age, filed an application with the Town to become a *part-time police officer*. On October 29, 1970 he was appointed a *Special Police Officer* by the Board of Selectmen, which was the appointing authority of the Town. The term of the appointment was to expire on April 30, 1971. On the date of his appointment he was added to the payroll at $3.70 per hour for an 8-hour day. … Following his appointment, Jones followed all the orders of the Chief of Police. . .. His duties included practically all those performed by Regular Police Officers, specifically: arrests, traffic duty, cruiser duty; securing protection for homes and business establishments, and appearances at Court to testify. He was assigned a uniform, badge and a revolver for use when necessary in the performance of his duties . . ." (emphasis supplied). It is agreed that there was no change in the plaintiff's status as a "special police officer" during the period between the date of his appointment and November 30, 1970, when, in the course of responding to a civil disorder, he sustained the injury which incapacitated him for duty.

The defendants argue that the provisions of G. L. c. 41, § 111F (note 2, *supra*), do not apply to a "special" police officer, as opposed to one who is a "regular" police officer or works full time. There is nothing in the language of § 111F itself or in the relevant statutory history of that

section[9] which lends any support to the defendants' contention. The word "regular" which appears in the second sentence of the section modifies the word "compensation," not the words "police officer,"[10] and there are too many instances in which the Legislature has seen fit to qualify the generality of the words "police officer" (G. L. c. 41, § 111F) or their ilk (G. L. c. 32, §§ 85E and 89; c. 41, §§ 96, 96A, 100, 100B and 111H; c. 147, §§ 17A and 17E; and see c. 152, § 69) by the use of such words as "regular" (G. L. c. 31, §§ 5 [24th par.] and 48; c. 32, § 89; c. 41, §§ 96B, 108E, 108G, 108K, 108L, 111A, 111D and 111L; c. 147, §§ 17B, 17C and 17G), "permanent" (G. L. c. 31, § 48; c. 32, §§ 83, 83A[b], 85, 85A, 85B, 85E and 89; c. 41, § 96B; c. 147, §§ 17B and 17G), "full time" (G. L. c. 41, §§ 96B, 98D and 108L), "reserve" (G. L. c. 32, §§ 85I and 89; c. 152, § 1[4]), "intermittent" (G. L. c. 32, § 89) or "special" (G. L. c. 32, § 89; c. 147, §§ 9 through 10K; c. 152, § 1[4]) to permit us to read the words "police officer" as used in G. L. c. 41, § 111F, to comprehend something less than every type of police officer. And we note that in *Thibeault* v. *New Bedford,* 342 Mass. 552, 554, 557 (1961), a patrolman who was classified as "probationary" for purposes of civil service was held to be entitled to the benefits of § 111F. Accordingly, we reject the defendants' contention that the present plaintiff is not entitled to the benefits of that section.

3. The following facts are gleaned from the master's subsidiary findings, as adopted by the judge. The plaintiff was injured on November 30, 1970, when he was struck in the left temporal region by a nineteen ounce rock which had been thrown through the open window of the police cruiser he was driving to the scene of the aforementioned civil disorder. The plaintiff was immediately taken by

[9] See 1952 Senate Doc. No. 376; 1952 House Doc. No. 2317; 1952 Senate Doc. No. 618; St. 1952, c. 419; St. 1958, c. 266; St. 1961, c. 218; St. 1964, c. 149.

[10] Compare the words "regular rate of compensation" which appear in the immediately preceding § 111E, as most recently amended by St. 1956, c. 45.

other police officers to the Leonard Morse Hospital in Natick, where he was examined by a Dr. Kim and then released. "When he awoke the following day, he ... could not see out of his left eye. He also had a sharp headache and was dizzy. He informed the Chief of his condition ... Jones returned to police duty and was provided with a police cruiser for routine patrol at a local super market parking lot. In operating the cruiser he had difficulty in perception as to distances and traffic to his left. He was unable to perform police functions with the same ability as prior to the November 30 incident and he was insecure in the performance of his duties."[11] He seems to have worked and been paid for several days following November 30. On December 5 he was examined by a Dr. LaSalle, to whom he had been referred by the chief of police. "In the early part of December, 1970, Jones requested a leave of absence from the Chief for reason of disability. The request was denied. At the insistence of the Chief, Jones attempted to perform assigned police duties, but he was unable and so notified the Chief." By the time of the hearing before the master the plaintiff had been examined by a succession of other physicians and claimed to be suffering in his left eye from a post traumatic hysterical ambylopia which was causally related to the injury of November 30, 1970.[12]

There is no dispute that the plaintiff was in fact incapacitated for duty on that date. It is reasonably to be inferred that the refusal to grant the plaintiff's December request for a leave of absence was prompted by advice received by the chief from Dr. Kim, from Dr. LaSalle, or from both, to the effect that the plaintiff was by then no

---

[11] See *Votour* v. *Medford,* 335 Mass. 403, 406 (1957), where it was said that G. L. c. 41, § 111F, "makes no distinction between total and partial incapacity. It provides only that if a police officer is incapacitated for duty, he shall be granted leave without loss of pay for the period of such incapacity."

[12] The parties have devoted considerable portions of their briefs to rehearsing the testimony before the master concerning the actual duration of the plaintiff's incapacity. We do not consider that evidence for the reasons stated in part 1 of this opinion.

longer incapacitated for duty.[13] Section 111F contemplates that the leave of absence provided for therein will continue until the occurrence of one of three events: the officer is "[1] retired or [2] pensioned ... or ... [3] a physician designated by the board ... authorized to appoint police officers ... determines that such incapacity no longer exists." Neither [1] nor [2] has occurred in the present case. The judge was troubled by the question whether a "physician designated by" the selectmen had ever "determine[d] that such incapacity no longer exist[ed]." As already explained, the judge himself entertained evidence on this point. The judge found and ruled, in effect, that the only serious candidate for that position was Dr. Kim and that he had not been "designated" by the selectmen within the meaning or for the purpose of § 111F. We are of the opinion that the judge must be upheld on this point.

It is clear from the master's subsidiary findings (quoted above) that the selectmen comprised the "board ... authorized to appoint police officers" within the meaning of § 111F.[14] There was introduced in evidence before the judge a copy of a formal vote adopted by the selectmen on February 9, 1970, that "Dr. Kim be designated to be the Doctor for examining the prospective patrolmen." There was another formal vote on February 17, 1970, that "physical examination[s of possible police candidates be] required as soon as possible with Dr. Robert M. Kim." There was no documentary evidence introduced before the judge that Dr. Kim had ever been appointed or otherwise designated by the selectmen to examine any police officer for the purpose of determination required by § 111F.[15] The medical

---

[13] We do not know what either doctor may in fact have reported to the chief of police or to the selectmen.

[14] We are told in the defendants' brief that the board acted under the provisions of G. L. c. 41, § 96.

[15] The judge was not required to believe the uncorroborated testimony of one of the selectmen, given four years after the event, that "after Mr. Jones came back to work and then complained, or said that he couldn't work, we reinstructed the Chief of Police to strike Mr. Jones's name from the duty roster and not to put him back on for duty until reexamined by Dr. Kim."

problems involved in determining the general physical fitness of applicants for positions as police officers may be quite different from the specialized problems which can be encountered in determining whether particular officers who have been injured in the performance of their duties continue to be incapacitated and shall continue to be paid without performing any duties whatsoever. The distinctions between the differing types of potential problems are illuminated by the master's finding in this case that "[a]s a result of complaints by Jones of loss of vision in his left eye, Dr. Kim referred him to ... an ophthalmologist."[16] If Dr. Kim acted in the manner described, we think it was open to the judge to find that Dr. Kim did not himself believe he had been designated to make a determination of the question whether the plaintiff continued to be incapacitated for duty. There was no evidence that the selectmen had ever purported to authorize Dr. Kim to act in their behalf in designating a physician for the purposes of § 111F.

We have examined all the evidence before the judge with care and have concluded that we cannot pronounce his findings on this point "clearly erroneous" within the meaning of either Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), or § 111F. See *Marlow* v. *New Bedford,* 369 Mass. 501, 508 (1976).[17] However, for the reasons stated in the next part of this opinion, we do not concur in the judge's conclusion that the selectmen's failure to designate a physician for the purpose of § 111F results in liability on the part of the town for an indefinite period of time.

4. The master found that on March 4, 1971, the plaintiff submitted his resignation in writing to the board of

---

[16] There was no evidence before the judge that the selectmen had authorized Dr. Kim to refer the plaintiff to an ophthalmologist.

[17] Nothing we have said in this part of our opinion is to be construed as holding that an appointing authority must make a case by case selection of physicians to make the medical determinations contemplated by § 111F. There is nothing in that section which prevents such an authority from designating a single physican to make all the determinations.

selectmen by a letter of that date in which he stated as follows: "I hereby submit my resignation as a Special Police Officer from the Town of Wayland. Due to circumstances and incidents which have occurred during and after active duty as an officer I feel as though my resignation is in the best interest of the Town of Wayland." On March 15, 1971, the selectmen voted to accept the plaintiff's resignation, on the understanding that it "[would] in no way affect or jeopardize any claim now under consideration for the period during which you acted as an officer for the Town." The judge appears to have ignored the plaintiff's resignation in his resolution of the case.

The words "leave without loss of pay," "retired" and "pensioned" which appear in G. L. c. 41, § 111F, are all words apt to describe the continued existence of a police officer's status as an employee of a town during any period when he is on "leave" under that section. Such a status was assumed, if not decided, in *Thibeault* v. *New Bedford,* 342 Mass. at 557, 558-559. Although § 111F appears to assume that an officer's status as an employee will continue until the occurrence of one of (1) retirement, (2) pensioning or (3) a proper determination of the termination of incapacity, there is nothing in the language of the section itself which precludes an officer's terminating his status as an employee by resigning his position at any time while he is on leave and prior to the occurrence of any of (1), (2) or (3). The usual rule is that anyone may terminate his status as a public employee by voluntarily submitting his resignation to his appointing authority, if his resignation is accepted by the authority. *Warner* v. *Selectmen of Amherst,* 326 Mass. 435, 437-439 (1950). *Campbell* v. *Boston,* 337 Mass. 676, 678 (1958). *Martin* v. *City Manager of Worcester,* 349 Mass. 760 (1965). *Galluccio* v. *Commissioner of Labor & Indus., post,* 864 (1976). There is nothing in this case which would warrant an inference that the plaintiff's resignation was prompted by fraud, compulsion or duress. See *Campbell* v. *Boston,* 337 Mass. at 679. We are of the opinion that the plaintiff's status as a special police officer was terminated when the selectmen

accepted his resignation from that position on March 15, 1971, and that the town's liability to make payments under § 111F terminated on that date.

5. The defendants set up in their answer to the bill that the plaintiff had been paid all his medical expenses resulting from his injury under a group insurance program paid for by the town, and that he had been paid "$1,000.00 for 10 weeks of alleged partial disability, and an additional $5,000." The master found the following additional facts, which we set out in the form in which they appear in the judge's decision. "On January 21, 1971 Jones gave notice in writing to the Insurance Company of North America of his claim under the group health and accident policy carried by the Town and under which the Town . . . Police are insured. This notice informed the said Insurance Company of his claim as a Special Police Officer for disability from the performance of his duties. The notice further indicated October 29, 1970 as the date of hiring; January 8, 1971 as the date last worked, and November 30, 1970 as the date disability commenced. In response to this claim, Jones received in addition to medical expenses the sum of $6,000." The master had ignored these findings in his computation of the net amount of money to which he thought the plaintiff was entitled. The defendants offered portions of the policy in evidence at the hearing before the judge. The offer was excluded, subject to the defendants' exception, but marked for identification.

The schedules of the policy were not included in the offer, but enough appears, we think, to show that the town had purchased the policy, that the plaintiff was an insured thereunder, and that the policy provided (a) a specific benefit for "entire and unrecoverable loss of sight" in one eye, (b) a weekly indemnity for a period of "continuous and total disability" and (c) medical expenses. The town is not liable for (a) or (c) under G. L. c. 41, § 111F, and can have no legitimate interest in, nor can it receive any credit in these proceedings for, any amount which the plaintiff may have received under either (a) or (c). The town does, however, have a direct interest in, and is en-

titled to a credit in these proceedings for, any portion of the $6,000 received by the plaintiff "in addition to medical expenses" which can be identified as having been paid to him by the insurance company by way of indemnity for any loss sustained by him by reason of the town's not paying him the wages due him under § 111F during the period of his incapacity. See and compare *Norwell* v. *Hartford Acc. & Indem. Co.* 358 Mass. 575, 577 (1971). Contrast *Shea* v. *Rettie,* 287 Mass. 454, 457-458 (1934). We are of the opinion that the judge erred in excluding the provisions of the policy and in refusing to take into consideration any amounts which the plaintiff may have received from the insurance company which represented wages for which the town was liable under § 111F.

The judgment is reversed, and the case is remanded to the Superior Court for a redetermination of the net amount of the town's liability (if any) to the plaintiff in accordance with the principles stated in this opinion. If the parties do not agree on the facts relevant to that determination, the facts are to be established by the court after a further evidentiary hearing. Costs of appeal are not to include the cost of reproducing the exhibits before the master or the cost of reproducing any portion of the testimony before the master which was not specifically adverted to by him in his summaries of evidence.

*So ordered.*