THOMAS H. TRACY & another[1] *vs*. THOMAS E. CURTIS
& others, individually and as trustees
(and a companion case).

Worcester.  February 11, 1980. — June 9, 1980.

Present: HALE, C.J., GRANT, & NOLAN, JJ.

*Fiduciary.  Trust,* Constructive trust.  *Corporation,* Officers and agents,
  Stockholder.  *Sale,* Of stock.  *Pleading, Civil,* Amendment.  *Practice,*
  *Civil,* Election of remedies; Master: findings.

In a derivative action by minority shareholders of a realty trust, a finding
  was not warranted that the defendant trustees breached their duty to
  the trust by acquiring for themselves, through the vehicle of a second
  realty trust in which the defendants held the sole interest, numerous
  properties which should have been offered to and acquired by the trust
  where the plaintiffs failed to show that the defendants had utilized any
  of the trust resources in acquiring the properties, that any of the acqui-
  sitions would have been in the best interests of the trust, or that the
  trust had been in a position to have financed any of the acquisitions.
  [17-18]
In a derivative action by minority shareholders of a realty trust, a finding
  was not warranted that the defendant trustees breached their duty to
  the trust in giving a corporation, to which a company owned by the
  defendants had sold all its assets, a right of first refusal to buy or lease
  the trust properties where the plaintiffs failed to show that the corpo-
  ration's exercise of that right would dampen the value or interfere with
  the ready disposal of the trust properties.  [18]
A judge erred in dismissing a derivative action by minority shareholders
  of a realty trust where findings that the defendant trustees had entered
  into employment contracts with a corporation, to which a company
  owned by the defendants had sold all its assets, and that the defendants
  had agreed to restrict their activities with respect to real estate opera-
  tions which would be used for or leased to businesses competing with the
  corporation and granted the corporation a right to prevent a "grocery
  type use" of the trust properties raised an inference that the defendants
  may have derived some measure of personal profit arising out of
  wrongful management of the affairs of the trust, and, therefore, the

---

[1] Dorothy C. Tracy, wife of Thomas.

matter was remanded for further findings as to the propriety of the compensation promised the defendants under the contracts. [18-20]

Upon appeal from a judgment dismissing a derivative action by minority shareholders of a realty trust, a master's finding that management fees paid to two corporations wholly owned by the defendant trustees had not been excessive could not be attacked on the ground that the master failed to make any finding as to the nature, quality or extent of the management services rendered to the trust where such a finding had not been requested by the plaintiffs. [20-21]

There was no merit to a claim by minority shareholders of a realty trust that the defendant trustees had managed the financing of the trust property in such a way as to result in personal gain to themselves at the expense of the trust. [21-23]

Where minority shareholders of a realty trust brought two actions against the trustees, one seeking relief on behalf of the plaintiffs as individuals with respect to the injuries sustained by them as the result of their having invested in the trust at the allegedly wrongful behest of the defendants acting as individuals and the other seeking relief on behalf of the trust by reason of the allegedly wrongful acts committed by the defendants while acting as trustees in the course of their management of the affairs of the trust after the plaintiffs had become shareholders thereof, a judge erred in denying the plaintiffs' motion to amend the individual action in order to eliminate any possibility of duplication or inconsistency in the two actions and in ordering the plaintiffs to elect between the two actions prior to trial. [23-26]

TWO CIVIL ACTIONS commenced in the Superior Court on April 7, 1976.

The first case, a shareholders' derivative action, was heard by *Beaudreau,* J., on a motion to dismiss.

In the second case, an individual action, the defendants' motion to require an election of remedies and the plaintiffs' motion for leave to amend their complaint were heard by *Meagher,* J.

*Ansel B. Chaplin* (*Andrew M. Higgins* with him) for the plaintiffs.

*Stephen H. Oleskey* (*Joan A. Lukey* with him) for the defendants.

GRANT, J. The plaintiffs have appealed from judgments of dismissal entered in two separate actions brought by them in the Superior Court. The first action (derivative ac-

tion) was brought by the plaintiffs as minority shareholders
of Curtlo Realty Trust (Curtlo), a Massachusetts business
trust with transferable shares (G. L. c. 182, §§ 1 et seq.),
against Thomas E. Curtis (Thomas), Richard D. Curtis
(Richard) and David J. Curtis (David), who at all material
times have been the only trustees of Curtlo, and seeks relief
in behalf of Curtlo by reason of various breaches of trust
which are alleged to have been committed by the defend-
ants as trustees in the course of their management of the af-
fairs of the trust.  See *Peterson* v. *Hopson*, 306 Mass. 597,
612 (1940); *Cohen* v. *United States Trust Sec. Corp.*, 311
Mass. 152, 161 (1942); Mass.R.Civ.P. 23.1, 365 Mass. 768
(1974).[2]  The second action (individual action) was brought
against the same defendants, in both their capacities, and
seeks relief in behalf of the plaintiffs as individuals by reason
of various misrepresentations and omissions to disclose rele-
vant information which are alleged to have been made or
committed by Thomas and Richard in the course of solicit-
ing the plaintiffs to invest in Curtlo, and while allegedly
standing in a fiduciary relationship to the plaintiffs.[3]  As
different facts, allegations and legal principles are applica-
ble to the two actions, we shall deal with the actions separ-
ately.

## THE DERIVATIVE ACTION.

The following is a summary of the relevant subsidiary find-
ings of fact made by the master in the derivative action.
Curtlo was formed in 1961 by Thomas, Richard, and David

[2] As nobody has made anything of it, we pass the point that the only
answer filed by the defendants in this action was in their capacities as the
trustees of Curtlo, despite the fact that any judgment in favor of Curtlo
would run against the defendants as individuals.  Why the plaintiffs took
no steps to default the defendants as individuals remains a mystery.

[3] The original complaint, as subsequently amended in a respect not here
material, sought relief against all three defendants in both their capacities.
Again, the only answer filed by the defendants was in their capacities as
trustees; again, we refrain from comment on the possible ramifications of
deficiencies in the pleadings.

(who are brothers), together with a fourth person who is no longer connected with or interested in the trust, for the purpose of purchasing and developing real estate which would be leased in whole or in part to various corporations (operating companies) which were or would be owned or controlled by the brothers, who were then engaged in the retail grocery business. By the end of 1962 the defendants were the only trustees and shareholders of Curtlo, which had 300 shares outstanding, had a paid in capital of $300, owned several parcels of real estate subject to mortgages, and was indebted to one of the operating companies in the amount of $63,000. The book value of a Curtlo share at that time was $0.276. The defendants wished to expand the operations of Curtlo. They decided to sell 300 units of Curtlo to outsiders at a price of $400 per unit. Each unit was to consist of one share of Curtlo and an interest-free loan to Curtlo in the amount of $83.33, which would be repayable in five annual installments.

In mid 1963 the plaintiffs, as the result of solicitation by Thomas and Richard, invested $30,000 in Curtlo, thus acquiring seventy-five of its shares and lending it $6,249.75 (which has been repaid). The other 225 units were sold to other outsiders. As the result of the sale of the entire 300 units Curtlo received a total of $120,000, of which $25,000 was treated as short term debt and $95,000 was treated as paid in capital. None of the defendants provided any additional capital at that time. Curtlo has never paid a dividend to its shareholders.

Between 1963 and 1968 Curtlo acquired and developed numerous parcels of real estate, which were then leased in whole or in part to the operating companies. The aggregate cost of these acquisitions and developments ran to several million dollars. That cost was financed by mortgage debt and by loans from the operating companies at rates varying from six to approximately ten and one-half per cent; no new capital was obtained in connection with the acquisitions.[4]

---

[4] By the time the present actions were commenced the only other outside shareholders were another husband and wife who owned fifty shares.

By 1970 Curtlo was indebted to the operating companies on at least $300,000 of demand notes. That indebtedness was refinanced in part by Curtlo's issuance of $200,000 of ten-year, twelve per cent debentures and $100,000 of ten-year, ten per cent convertible debentures. Such of the debentures as were not purchased by outside shareholders (not including the plaintiffs) were taken up by the operating companies or by various family trusts controlled by the defendants.

In 1965 the defendants formed two corporations, wholly owned by them, for the purpose of managing the various Curtlo properties. During the period of 1965 through 1977 Curtlo paid these corporations substantial management fees, calculated at the rate of five per cent of the nontax component of the rents received by Curtlo. The master ultimately found that the amounts paid by Curtlo to the management companies had been reasonable.

At the 1968 annual meeting of the shareholders one of the outside shareholders "proposed . . . that Curtlo cease acquisition of additional property and concentrate its efforts on developing the property it then owned. Thomas . . . stated to the shareholders at that meeting that he would therefore continue acquisition of additional property himself. [The female plaintiff] was present at the meeting and voiced no objection thereto. However, no vote was taken thereon."[5] Curtlo does not appear to have made any further property acquisitions after the 1968 annual meeting.

In 1970 Thomas formed an entity by the name of South Shore Realty Trust (South Shore), with himself as the sole trustee and with the entire beneficial ownership being vested in the three defendants. During the next two years South Shore proceeded to acquire some fifteen parcels of real estate. Some of them appear to have been located in the same general area as properties owned by Curtlo; some of them appear to have been leased in part to one of the operating companies.

---

[5] The quotation is taken from the master's original report. His supplemental report contains a slightly different version of what was said at that meeting. In the view we take of this aspect of the case, nothing turns on the difference between the two versions of what was said.

In 1972 the defendants caused all the operating companies to be merged into a single corporation, which then proceeded to sell substantially all its assets to Angelo's Supermarkets, Inc. (Angelo's). Some of the leases between Curtlo and the operating companies were assigned to Angelo's with the approval of the outside shareholders (including the plaintiffs); other leases were cancelled and replaced by new leases which were negotiated by the defendants. The master made the following findings on this branch of the case: "36. In conjunction with the sale of the assets of [the surviving operating company] to Angelo's employment contracts between Angelo's and each of the [d]efendants were entered into for a period of five years and these were subsequently extended for an additional year in the cases of Thomas . . . and Richard . . . 37. *Each employment contract* contains a non-competing convenant for a 10 year period covering the eastern half of Massachusetts up to and including Worcester County and *restricted the employees in respect to engaging in real estate operations which would be used for or leased to businesses competing with Angelo's. Consideration* for these non-competing covenants are recited as $160,000 in the case of Thomas . . . and $76,000 in the cases of Richard . . . and [David][6] . . . and is payable in weekly installments over a 10 year period commencing on termination of his respective employment. 38. *Curtlo* granted Angelo's a right of first refusal to buy or lease its properties and also *granted Angelo's a right to prevent a grocery type use of its properties*" (emphasis supplied). Further facts, or the absence thereof, will be adverted to at later points in this part of our opinion.

The plaintiffs filed a plethora of objections, requests and motions addressed to the master's report, which was recommitted for further findings on the question, among others, of the reasonableness of the management fees paid to the Curtis entities. There were further objections, requests and motions addressed to the supplemental report. A perusal of the various

[6] The name "Thomas" appears at this point in the findings, but it is obvious that "David" was intended.

facets of the assault on the reports discloses that some of the
objections were to failures of the master to make specific
findings desired by the plaintiffs (see *Minot* v. *Minot*, 319
Mass. 253, 259, 261 [1946]); that other of the objections and
motions raised purely discretionary questions as to whether
there should be further subsidiary findings on particular
points (see *Black* v. *Parker Mfg. Corp.*, 329 Mass. 105,
117-118 [1952]); and that many objections framed in terms
of the insufficiency of the evidence to warrant particular sub-
sidiary findings dissolve into complaints as to the weight or
interpretation which the master chose to place on particular
items of evidence (see *H. Piken & Co.* v. *Planet Constr.
Corp.*, 3 Mass. App. Ct. 246, 248 [1975]). Some facets of the
assault were grounded on the contents of exhibits before the
master which were not properly before the court. See and
compare *Whaler Motor Inn, Inc.* v. *Parsons*, 3 Mass. App.
Ct. 662, 665 (1975), *S.C.*, 372 Mass. 620 (1977), *S.C.*, sub
nom. *Whaler Motor Inn, Inc.* v. *Freedman*, 9 Mass. App.
Ct. 884 (1980); *Martin* v. *Commonwealth Acceptance
Corp.*, 8 Mass. App. Ct. 932 (1979); *Glynn* v. *Gloucester*, 9
Mass. App. Ct. 454, 458 n.6 (1980).[7] Another facet was
directed to the alleged inadequacy of the master's summaries
of evidence. The court had approved the appointment of a
stenographer to take the testimony before the master (com-
pare *Jones* v. *Wayland*, 4 Mass. App. Ct. 725, 726-727, 729
[1976], *S.C.*, 374 Mass. 249 [1978], *S.C.*, 380 Mass. 110
[1980]), but it does not appear from any of the portions of the
record reproduced in the record appendix, nor does it appear
that the court was otherwise advised, that the stenographic
transcript had been supplied to the master, as contemplated
by the second sentence of the fourth paragraph of Rule 49,
§ 7, of the Superior Court, as amended effective May 8,
1976. Compare *Buckley & Scott Util. Inc.* v. *Petroleum Heat
& Power Co.*, 313 Mass. 498, 507-508 (1943); *Herbits* v.
*High-Speed Process Printing Corp.*, 358 Mass. 817 (1971). If
the transcript was supplied to the master, it has not been

---

[7] Several of the plaintiffs' arguments on the merits suffer from the same
difficulty.

made to appear that the plaintiffs were harmed by the master's failure to comply with the requirements of the last two sentences of the same paragraph of rule 47. Numerous of the objections still argued disclose an unnecessary preoccupation with the master's ultimate findings, which were based on his subsidiary findings, were not binding on the judge who adopted the reports and are not binding on us. See *O'Brien* v. *Dwight*, 363 Mass. 256, 281-282 (1973); *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660, 662 n.3 (1975); *Sancta Maria Hosp.* v. *Cambridge*, 369 Mass. 586, 591 (1976). We shall consider later such of the objections and motions as are still viable and material to our disposition of this action.

We turn now to the arguments which have been advanced by the plaintiffs with respect to the four general areas of relief sought by them, having in mind that the plaintiffs had the burden of proving any misappropriation or mismanagement by the defendants, as well as the burden of proving any harm to the trust which might have resulted from any such misappropriation or mismanagement. *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 516-517 (1905). *Columbian Insecticide Co.* v. *Driscoll*, 271 Mass. 74, 78 (1930). *Crowell & Thurlow S.S. Co.* v. *Crowell*, 280 Mass. 343, 352 (1932). *Spiegel* v. *Beacon Participations, Inc.*, 297 Mass. 398, 412 (1937). *Durfee* v. *Durfee & Canning, Inc.*, 323 Mass. 187, 204-205 (1948).

1. The plaintiffs complain first that the defendants misappropriated "corporate" opportunities by acquiring for themselves, through the vehicle of South Shore, numerous properties which should have been offered to and acquired by Curtlo. The plaintiffs had the burden of proving that the actions of the defendants in this respect were unfair to Curtlo. *Murphy* v. *Hanlon*, 322 Mass. 683, 686-687 (1948). A careful review of the relevant subsidiary findings of the master discloses nothing beyond the bare fact that South Shore ended up owning properties of the same general type as those previously acquired by Curtlo. There is nothing in the subsidiary findings which warrants an inference that the defendants utilized any of the resources of Curtlo in acquir-

ing any of the South Shore properties, that any of the acquisitions would have been in the best interests of Curtlo, or that Curtlo was in a position to have financed any of the acquisitions.[8]  See *American Circular Loom Co.* v. *Wilson,* 198 Mass. 182, 206-207, 210 (1908); *Beaudette* v. *Graham,* 267 Mass. 7, 13 (1929); *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 420-423 (1941); *Black* v. *Parker Mfg. Co.,* 329 Mass. at 111-114.  We conclude that the plaintiffs have failed to sustain their burden of proof on this aspect of the case.

2.  The plaintiffs advance several contentions with respect to the transactions by which the surviving operating company disposed of substantially all of its assets to Angelo's. They complain first of the defendants' having given Angelo's a right of first refusal to buy or lease the Curtlo properties. The master's subsidiary findings do not reveal the terms of that right or the circumstances in which it can be exercised.[9] In particular, the plaintiffs have failed to show that the exercise of that right would dampen the value or interfere with the ready disposal of any of the Curtlo properties.  We conclude that there was a failure of proof on the question of harm to the trust.

The plaintiffs do not complain of the mere fact of the defendants' having accepted compensated employment with Angelo's or of their having entered into personal covenants not to compete with it in the retail grocery business; except as hereinafter indicated, such employment and covenants were none of Curtlo's business.  Their principal complaint as to the transactions with Angelo's is that the master's subsidiary findings numbered thirty-six through thirty-eight which have been quoted above, and particularly the italicized portions thereof, raise a clear implication that some part of the aggregate of $312,000 of deferred compensation which is to be paid to the defendants by Angelo's represents

---

[8] The master found that the cost of all the South Shore properties was raised by a combination of mortgage debt and loans from the operating companies.

[9] There was no request for further findings on this point.

a quid pro quo for the defendants' having agreed to restrict their activities "in respect to engaging in real estate operations which would be used for or leased to businesses competing with Angelo's" and for their having caused Curtlo to "[grant] Angelo's a right to prevent a grocery type use of [Curtlo's] properties."

We concur in the inference that can be drawn from those findings and detect a distinct likelihood that the defendants have derived some measure of personal profit arising out of wrongful management of the affairs of the trust. Compare *O'Brien v. Dwight*, 363 Mass. at 283-284, and cases cited. The master attempted to pull a shroud over this and several other questioned transactions by vague subsidiary and ultimate findings to the effect that the plaintiffs were or should have been aware of at least the substance of the transactions. Such findings, even if correct, were meaningless in the absence (as here) of any finding from which it could properly have been inferred that the plaintiffs and the other outside minority shareholders[10] had consented to or ratified the challenged aspects of the transactions with Angelo's. See *Durfee v. Durfee & Canning, Inc.*, 323 Mass. at 202-203.[11] We are of opinion that the interests of justice require reversal of the judgment of dismissal and a remand for further and thorough exploration of the details and possible ramifications of the transactions with Angelo's in proceedings in which the defendants will have the burden of proving the propriety of all the compensation received from or promised by Angelo's. See *Shaw v. Harding*, 306 Mass. 441, 447 (1940); *Durfee v. Durfee & Canning, Inc.*, 323 Mass. at 201; *Winchell v. Plywood Corp.*, 324 Mass. 171, 177 (1949); *Production Mach. Co. v. Howe*, 327 Mass. 372, 378-379

---

[10] The master appears to have regarded this case as a personal dispute between the named parties and to have forgotten that a derivative action is brought for the benefit of all the shareholders not charged with wrongdoing.

[11] We do not know the judge's reasons for adopting the master's reports and dismissing the derivative action.

(1951); *Samia* v. *Central Oil Co.*, 339 Mass. 101, 126-128 (1959); *First Natl. Bank* v. *Brink*, 372 Mass. 257, 264 (1977).

3. The plaintiffs addressed several objections, requests and motions to the master's original ultimate finding that the management fees Curtlo had paid the defendants' companies had not been "excessive." The order by which the report was recommitted to the master directed him to make subsidiary findings of fact "pertaining to the conclusion that the management fees charged by defendants were appropriate." The master, in his supplemental report: set out the formula by which the management fees had been calculated (five per cent of the nontax component of the rents received by Curtlo); found that that formula had been determined by Thomas and Curtlo's accountant "after discussions with real estate management concerns and real estate companies in the area"; opined that Thomas "by virtue of his training and experience, is an expert on ownership, management and development of supermarkets and shopping centers containing grocery stores . . . competent to testify as an expert on the reasonableness of the management fees charged to Curtlo"; and found, on the basis of Thomas's testimony, that the fees charged to Curtlo had been reasonable. The plaintiffs filed objections to and a motion to strike the portions of the further report which have just been quoted, which were overruled and denied, respectively. The plaintiffs also filed a broadside motion for further recommittal, which was also denied; as we read that motion, no part of it was specifically addressed to what has just been quoted.

The plaintiffs now contend, in effect, that the master's finding of reasonableness should have been struck because he failed to make any finding as to the nature, quality or extent of the management services rendered to Curtlo. The dispositive answer to this contention is that no such question was raised below. See and compare *John B. Deary, Inc.* v. *Crane*, 4 Mass. App. Ct. 719, 724 (1976); *Paris Paper Box Co.* v. *Boston*, 7 Mass. App. Ct. 902, 903 (1979). As we read them, the only objections to the master's further report on the subject of management fees were directed (1) to the

competence of Thomas to testify to the reasonableness of the fees and (2) to the weight that the master chose to accord to Thomas's testimony. The first objection was devoid of merit. *Stein* v. *Strathmore Worsted Mills*, 221 Mass. 86, 90-91 (1915). *Winthrop Prod. Corp.* v. *Elroth Co.*, 331 Mass. 83, 84-85 (1954). *Boston Gas Co.* v. *Assessors of Boston*, 334 Mass. 549, 573-574 (1956). *Newton Girl Scout Council, Inc.* v. *Massachusetts Turnpike Authy.*, 335 Mass. 189, 198 (1956). *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 606 (1961). The second objection was equally devoid of merit (see *Assessors of Quincy* v. *Boston Consol Gas Co.*, 309 Mass. 60, 72 [1941]; *Whaler Motor Inn, Inc.* v. *Freedman*, 9 Mass. App. Ct. 884 [1980]), particularly when considered in light of the fact that the plaintiffs introduced no testimony to rebut that of Thomas.

4. As we understand it, the plaintiffs advance two basic contentions concerning what they characterize as "the highly unusual manner in which [the defendants] financed the purchase and development of the Curtlo properties." The first is that the defendants managed the financing in such fashion as to result in personal gain to themselves at the expense of the trust and thus at the expense of the outside shareholders. In this connection the plaintiffs proceed with an elaborate rehearsal of the process by which the defendants contributed only a negligible amount of equity capital ($300), raised very little by way of short term loans ($25,000) and equity capital ($95,000) from outsiders, borrowed substantial amounts (at least $300,000) from the operating companies at various rates of interest (ranging from six to ten and one half per cent), and then refinanced those borrowings by the issuance of interest bearing (at rates of ten and twelve per cent) debentures which were largely taken up by the operating companies and other Curtis entities,[12] all without paying any dividend on the equity capital.

---

[12] This rehearsal overlooks the fact that a major portion of the aggregate cost of the acquisitions and developments was raised by incurring mortgage indebtedness.

This argument suffers from lack of a factual predicate. The master specifically found that the rates at which Curtlo borrowed money from the operating companies and other Curtis entities were the same as the rates which the companies "had to pay in order to borrow the money which [they] loaned to Curtlo as operating capital," that "the loans which the [defendants] obtained were at interest rates commensurate with interest rates being charged by lending institutions," that "[t]he debentures were offered to all of the shareholders of Curtlo,"[13] and that "[t]he interest charges in all cases were at a reasonable and proper rate."[14] There is nothing to suggest that any portion of any of the borrowings was unnecessary or unreasonable. Nor has there been any showing of mismanagement of the debt ratio of Curtlo (see Henn, Corporations § 166 [2d ed. 1970]; 1 O'Neal, Close Corporations § 209 [2d ed. 1971 and 1979 Supp.]), or any showing that the management of the debt ratio resulted in harm to the trust.

The plaintiffs' other contention on this branch of the case appears to be that it was unreasonable or somehow unfair for the defendants to have contributed only $300 for half the equity investment and then to have solicited $95,000 from outsiders for the other half of the equity.[15] But, as the plaintiffs all but concede in their brief, any claim which they might have in this area would be personal to them and not the proper subject of a derivative shareholders action. *Beaudette* v. *Graham*, 267 Mass. at 11. *Shaw* v. *Harding*, 306

---

[13] Some of the outside shareholders purchased debentures, but the plaintiffs declined to do so.

[14] No significant challenge was ever offered to the accuracy of any of the quoted findings.

[15] There is nothing in the findings in this case which would warrant an inference that any of the defendants ever misrepresented or concealed the fact that they had paid only $300 in cash for the 300 shares which were issued by Curtlo when it was formed in 1963. Contrast *Whaler Motor Inn, Inc.* v. *Parsons*, 3 Mass. App. Ct. at 669, 670, 672, *S.C.*, 372 Mass. at 624, 626. The master found that the defendants performed services in organizing Curtlo and that they personally guaranteed the repayment of bank loans made to it.

Mass. at 448. *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. 578, 579 n.4 (1975).

## THE INDIVIDUAL ACTION.

As already stated, the individual action seeks relief in behalf of both plaintiffs against all three defendants by reason of various misrepresentations and omissions to disclose relevant information which was alleged to have been made or committed by Thomas and Richard in the course of soliciting the plaintiffs to invest in Curtlo, and while allegedly standing in a fiduciary relationship to the plaintiffs. Fairly read, the complaint, as amended in a respect not here material, finds no fault with the manner in which the defendants have managed the affairs of Curtlo. It contains prayers: for a determination of the present net asset value of a share of Curtlo (no. 1); for an order requiring Curtlo to issue additional shares to the plaintiffs or pay them interest on their original interest-free loans of $6,250 to the trust (no. 2); for orders that Curtlo stand ready to redeem the plaintiffs' shares in cash at their present net asset value to the extent that can be accomplished "without substantial detriment to the interests of" the other outside shareholders (nos. 3 and 4); for rescission of the plaintiffs' share purchases against the defendants as individuals (nos. 5 and 6); and for general relief (no. 8).[16]

The derivative and the individual actions were both filed on April 7, 1976. Extensive discovery was conducted in both cases. On January 3, 1978, the parties secured the allowance of their joint requests for a date certain for the commencement of the trial of both actions. Discovery continued. The docket sheets disclose a subsequent stipulation of the

---

[16] None of the other prayers is of any present materiality. We merely recite the relief which has been requested and intend no intimation on the availability or propriety of any of it. We note, however, that a simple judgment for money damages can be awarded under a prayer for general relief such as prayer no. 8. See *E. Kronman, Inc.* v. *Bunn Bros.*, 258 Mass. 562, 568 (1927); *Boylston Housing Corp.* v. *O'Toole*, 321 Mass. 538, 543 (1947); Mass.R.Civ.P. 54(c), 365 Mass. 821 (1974).

parties concerning the use of certain discovery documents in the trial of both actions. On May 22, 1978, the defendants filed in the individual action (but not in the derivative action) a motion which, in its recitals, sought to obfuscate the distinctions between the plaintiff's rights as individuals and their rights as shareholders of Curtlo[17] and which prayed, in the alternative, that the individual action (not the derivative action) be dismissed or for "a requirement that the plaintiffs elect remedies before trial and that the case not elected by them be dismissed." On May 26 a judge of the Superior Court, by some form of order which has not been put before us, denied so much of the motion as sought an outright dismissal of the individual action but ordered the plaintiffs to elect between the two actions prior to trial.[18] The reasons for the judge's actions do not appear in the record.

The plaintiffs promptly moved (1) for leave to amend the prayers of the amended complaint so as to substitute for their then prayer no. 2 new prayers in the alternative for the imposition of a constructive trust on shares of Curtlo owned by the defendants or for an order requiring the defendants as individuals to pay the plaintiffs interest on their original loans to Curtlo and (2) to vacate the order as to an election. The motion to amend recited as its purpose "to make clear that plaintiffs may be granted full and complete relief in this action without diluting in any way the interest of the other two minority shareholders." The motion to vacate recited as its basis that the allowance of the proposed amendment would "eliminate[ ] any possibility that a successful outcome in this action might dilute the interest of other minority shareholders." The same judge denied both motions without any explanation of reasons.[19] On June 7 he

[17] The motion cited but misconstrued the import of *Donahue* v. *Rodd Electrotype Co.*, 367 Mass. at 579 n.4.

[18] The relevant docket entry reads, "Mo. #57 to dismiss, denied; plff. order[ed] to elect his remedies prior to trial."

[19] See *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 291 n.2 (1977); *Evans Prod. Co.* v. *D. J. Development Corp.*, 6 Mass. App. Ct. 306, 309 (1978).

entered orders referring both cases to the same master and ordered the plaintiffs to elect between the two actions prior to the commencement of hearings before the master, which was set for June 15. The plaintiffs seasonably elected to dismiss the individual action, a formal judgment of dismissal was entered, and the derivative action went forward before the master. We find error in the order for an election and in the denial of the motion to amend.

It is obvious that the two actions were based on entirely separate and distinct causes of action (compare *Wilson* v. *Jennings*, 344 Mass. 608, 611, 613, 621 [1962]) brought by the plaintiffs in different capacities. The complaint in the individual action, as proposed to be further amended, seeks relief in behalf of the plaintiffs as individuals with respect to the injuries sustained by them as the result of their having invested in Curtlo at the allegedly wrongful behest of the defendants acting as individuals; no relief is sought in behalf of the trust. The complaint in the derivative action seeks relief in behalf of the trust by reason of the allegedly wrongful acts committed by the defendants while acting as trustees in the course of their management of the affairs of the trust after the plaintiffs became shareholders thereof; except for the confusion adverted to at the conclusion of our discussion of the derivative action, no relief is sought in behalf of the plaintiffs as individuals. This is not an instance in which the same plaintiffs are attempting to split a cause of action or to proceed by separate legal theories to enforce the same cause of action. Contrast *Bradley* v. *Brigham*, 149 Mass. 141, 144 (1889); *Dalton* v. *American Ammonia Co.*, 236 Mass. 105, 107 (1920). Any possibility of overlapping recovery or of outstanding judgments based on inconsistent legal theories could have been ironed out after the adoption of the master's reports and prior to the entry of any judgment. See *Rock-Ola Mfg. Corp.* v. *Music & Television Corp.*, 339 Mass. 416, 426 (1959), and cases cited. Compare *Raimondo* v. *Burlington*, 366 Mass. 450, 451 (1974).

The further motion to amend appears to have been designed to eliminate any such possibility of duplication or in-

consistency in advance of trial. The allowance of that motion would have confined the plaintiffs as individuals to relief against the defendants as individuals and would have eliminated any possible conflict between the interests of the plaintiffs as individuals in the individual action and the interests of the plaintiffs as the representatives of the trust and the only other outside shareholders in the derivative action.[20] The allowance of the proposed amendment would not have introduced a new cause of action, nor would it have injected a new and unexplored theory of liability. Contrast *Castellucci* v. *United States Fid. & Guar. Co.*, 372 Mass. 288, 291-292 (1977); *Wiska* v. *St. Stanislaus Social Club, Inc.*, 7 Mass. App. Ct. 813, 819 (1979). There was nothing to suggest, and even now it is not argued, that the defendants would have been prejudiced by the allowance of the amendment. Compare *Wolfe* v. *Ford Motor Co.*, 6 Mass. App. Ct. 346, 353-354 (1978).

There is no visible merit to the defendants' barely articulated contention that the plaintiffs were not harmed by the dismissal of the individual action because certain findings made by the master in the derivative action will now preclude the maintenance of the individual action. The contention overlooks the different capacities of the plaintiffs in the two actions, and it is obviously too early to tell whether the findings now relied on by the defendants will be essential to whatever judgment may ultimately be entered in the derivative action. See *Rudow* v. *Fogel*, 376 Mass. 587, 589, 591 (1978).

---

[20] We note that the defendants have never moved to dismiss the derivative action on the ground that the plaintiffs could not "fairly and adequately represent the interests of" the other two outside shareholders within the meaning of Mass.R.Civ.P. 23.1, 365 Mass. 768 (1974). See and contrast *G. A. Enterprises, Inc.* v. *Leisure Living Communities, Inc.*, 66 F.R.D. 123, 126-127 (D. Mass. 1974), aff'd 517 F.2d 24, 26-27 (1st Cir. 1975); *Blum* v. *Morgan Guar. Trust Co.*, 539 F.2d 1388, 1390 (5th Cir. 1976); *Robinson* v. *Computer Servicenters, Inc.*, 75 F.R.D. 637, 643 (N.D. Ala. 1976).

## DISPOSITION.

Both the judgments are reversed, and the cases are remanded to the Superior Court for further proceedings not inconsistent with this opinion; the plaintiffs are to have costs of both appeals, except the cost of reproducing the exhibits which were not referred to by the master in his summaries of the evidence;[21] the court is to give serious consideration to the conduct of any further trial before a judge rather than a master.[22]

*So ordered.*

---

[21] Compare *Jones* v. *Wayland*, 4 Mass. App. Ct. at 726-729, 737, *S.C.*, 374 Mass. at 263.

[22] See and compare *O'Brien* v. *Dwight*, 363 Mass. at 279-280, 298.